PEOPLE v McLAUGHLIN

Docket No. 234433. Submitted June 11, 2003, at Detroit. Decided September 25, 2003, at 9:05 A.M. Leave to appeal sought.

Xavier D. McLaughlin was convicted by a jury trial in Macomb Circuit Court, George E. Montgomery, J., on three counts of first-degree criminal sexual conduct (CSC), MCL 750.520b(1)(e), after he assaulted the victim, his former girlfriend, while armed with a knife. Each conviction was based on a separate sexual penetration of the victim. The defendant was sentenced to nine to twenty-five years' imprisonment for each conviction. The defendant appealed, arguing that he is entitled to a new trial because of several instances of prosecutorial misconduct, errors in the admission of evidence, and an error in the jury instructions. The defendant also argues that the circuit court erred in scoring offense variable (OV) 11, regarding sexual penetration of a victim, at fifty points in calculating the defendant's sentence for each conviction.

The Court of Appeals *held*:

1. The defendant was not denied his right to a speedy trial under MCL 780.131 or MCR 6.004(D) because these provisions only apply to defendants who were imprisoned in state penal institutions before trial, and not to individuals who, like the defendant, were imprisoned in county jails before trial. Similarly, the defendant failed to establish that he was denied his right to a speedy trial under the federal and state constitutions because he failed to demonstrate prejudice, which is essential where the delay in trial, as here, was less than eighteen months. US Const, Am VI; Const 1963, art 1, § 20.

2. The prosecutor did not commit misconduct by interrupting the defense counsel's objection to a hypothetical question, because this brief incident of impatience did not constitute a personal attack on the defense counsel, and was too unremarkable to constitute an obvious error that denied the defendant his right to a fair trial. Similarly, the prosecutor's mildly sarcastic remark to the defense counsel that he did not want to hear "another speech" by counsel was not so prejudicial that it could have affected the defendant's substantial rights. The defendant did not establish that the cumulative effect of these alleged instances of misconduct deprived him of a

fair trial because they were either too brief, or took place outside the presence of the jury. Finally, although the prosecutor engaged in unnecessarily combative behavior during the trial, the circuit court addressed this issue by instructing the prosecutor to refrain from doing so.

3. To the extent that the trial court erred in admitting under MRE 803(4), as statements made to obtain medical treatment or diagnosis, the written record of the sexual assault nurse examiner containing the nurse's observations regarding the victim, and the victim's statements that the defendant assaulted her, the evidence was admissible under the business records exception to the hearsay rule. MRE 803(6). The defendant's argument that MRE 803(6) did not apply because the nurse was not the custodian of the record is without merit because the actual custodian need not testify to satisfy the requirements of the exception.

4. The trial court erred in excluding evidence of the victim's prior consensual sexual relations with the defendant solely on the basis that the defendant did not give notice of his intent to introduce this evidence under the rape-shield statute, MCL 750.520j. Rather, the trial court should have exercised its discretion with regard to whether the evidence should be admitted. The record reveals that the admission of evidence of the victim's sexual relations with the defendant before her back injury and subsequent surgery would not have served any legitimate purpose since it had been established that the victim and the defendant had a consensual sexual relationship before the assault. However, evidence that the victim had consensual sexual relations with the defendant after her back injury would have served a legitimate purpose since the victim testified that she did not have consensual sex with the defendant after her surgery. Nonetheless, the exclusion of this evidence was harmless because the defendant gave inferential testimony to this effect, and the defendant's delay in offering this evidence weighed in favor of its exclusion.

5. Any error in permitting the sexual assault nurse examiner to testify as an expert when she was not listed as an expert witness in response to a request under MCR 6.201(A)(1) was harmless, because MRE 701 permits lay witnesses to testify about opinions and inferences that are rationally based on the witness's perception and are helpful to a clear understanding of the witness's testimony or the determination of a fact in issue at trial. The nurse's testimony regarding her observations of the victim during her examination fell within these limitations and could not be construed as highly "specialized knowledge" offered by an expert under MRE 702. Only her testimony that vaginal injuries are uncommon in rape

cases involving mature women who have given birth could be considered specialized information not commonly known, and any error in the admission of this evidence was harmless because it is highly improbable that this testimony was the deciding factor in how the jury resolved the credibility contest between the victim and the defendant.

6. Testimony by a police officer that the victim identified the defendant as her assailant was admissible under MRE 803(2) as an excited utterance. The evidence revealed that the police officer responded to the victim's call within minutes, and that when he arrived at the scene, the victim was visibly upset and having trouble breathing. Thus, it could be inferred that the rape was the cause of the victim's stress and that she was still under the influence of the stress when she made the statement to the officer.

7. Pursuant to precedent interpreting MCL 600.1436, the trial court erred in allowing the prosecutor to question a defense witness about religion. A trial court or prosecutor may not inquire of a defendant concerning the nature, substance, and content of his religious beliefs in order to show that such beliefs are inconsistent with the qualities of good character claimed by a defendant. This principle extends to prohibit the questioning of one witness about another witness's beliefs. Here, while the prosecutor's questioning of the witness did not actually delve into the substance of the witness's or anyone else's religious beliefs, the questions were clearly meant to elicit a discrepancy between the defendant's purported spirituality and his conduct in this case. Reversal, however, is not automatically warranted on the basis of this unpreserved error because the prosecutor did not actually ask questions regarding the defendant's religious beliefs and his behavior. Furthermore, this was a minor incident in the examination of a minor witness, and was too insignificant to deprive the defendant of a fair trial.

8. Although evidence of poverty is generally not admissible to show motive to commit a crime, the prosecutor's questioning of the defendant regarding the victim's lack of any pecuniary gain in claiming that the defendant raped her was admissible because it was relevant to dispelling the defendant's argument that the victim had falsely accused him. Additionally, evidence of the defendant's financial, housing, and employment situation was relevant to the prosecutor's theory of the case, and in showing that the defendant and the victim's relationship had deteriorated because of his situation.

9. The trial court did not err by instructing the jury, at the prosecutor's request, that voluntary intoxication is not a defense to first-degree CSC. CJI2d 6.1. While the evidence did not directly

establish that the defendant was intoxicated at the time of the assault, the jury could have inferred this from the evidence that he had an ongoing drug problem and that he had spent all his money on drugs hours before the crime. Consequently, the prosecutor had legitimate cause to be concerned that the jury might believe that the defendant was intoxicated at the time of the rape and erroneously conclude that he was not legally accountable for his actions.

10. The defendant's sentence of nine to twenty-five years' imprisonment was not disproportionate because it is undisputed that his minimum sentence was within and at the low end of the sentencing guidelines. MCL 769.34(2)-(3), (10).

11. The defendant's argument, that OV 11 should have been scored at zero points, instead of fifty, for each of his three convictions because the trial court cannot score the one penetration that forms the basis of a first-degree CSC offense under MCL 777.41(2)(c), is without merit. A reasonable construction of OV 11 requires the trial court to exclude the one penetration forming the basis of the offense when the sentencing offense itself is first-degree or third-degree CSC. Under this interpretation, trial courts may assign points under subsection 41(2)(a) for "all sexual penetrations of the victim by the offender arising out of the sentencing offense," while complying with the mandate of subsection 41(2)(c), by not scoring points for the one penetration that forms the basis of a first- or third-degree CSC offense. Here, the trial court properly scored OV 11 at fifty points for each of the defendant's convictions.

Affirmed.

SENTENCES — SENTENCING GUIDELINES — OFFENSE VARIABLE 11 — SCORING.

For purposes of scoring the sentencing guidelines variable relating to the sexual penetration of a victim by the offender, the trial court should not score the one penetration forming the basis of the offense when the sentencing offense itself is first- or third-degree criminal sexual conduct, but may score all other penetrations of the victim by the offender arising out of the sentencing offense (MCL 777.41[2][a], [c]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Carl J. Marlinga*, Prosecuting Attorney, *Robert J. Berlin*, Chief Appellate Attorney, and *Edward L. Graham*, Assistant Prosecuting Attorney, for the people.

*Gary L. Kohut* for the defendant.

Before: OWENS, P.J., and BANDSTRA and MURRAY, JJ.

MURRAY, J. Following a jury trial in the Macomb Circuit Court, defendant was convicted on three counts of first-degree criminal sexual conduct (CSC), MCL 750.520b(1)(e) (sexual penetration while armed with a weapon). Defendant was sentenced to nine to twenty-five years' imprisonment for each conviction. On appeal, defendant argues that he is entitled to a new trial because of several instances of prosecutorial misconduct, several evidentiary errors, and errors in the jury instructions. Defendant also asserts that errors occurred at sentencing. After consideration of defendant's arguments, we conclude that defendant is not entitled to a new trial and that no errors occurred at sentencing. Consequently, we affirm defendant's convictions and sentences.

## I. FACTUAL BACKGROUND

The victim met defendant in December 1999 or January 2000, when defendant was working with the victim's daughter. The victim and defendant developed an amorous relationship, and moved in together soon after they met. The victim, her daughter, and defendant lived together in an apartment in Warren.

Approximately one month after defendant and the victim began dating, defendant told the victim that he used crack cocaine and that he was spending most of his paychecks on crack cocaine. Nonetheless, defendant and the victim sought counseling regarding their relationship and his drug problem from their pastor, Reverend James Moore, and his wife, Missionary Edythe Moore. At trial, defendant denied ever using crack cocaine.

On May 9, 2000, the victim fractured her spine and was hospitalized for three weeks following corrective surgery. The victim and her daughter both testified that defendant sold or pawned their possessions to buy drugs while the victim was in the hospital. The victim contended that she ended her relationship with defendant in May 2000, because he failed to resolve his drug addiction; however, defendant claimed the relationship continued.

Soon after leaving the hospital, the victim rented an efficiency unit in a motel in Warren for herself and her daughter. The victim remained partially immobile from the surgery and used a hospital bed to lie with her knees elevated. The victim testified that she was in too much pain to have any interest in sex during this time.

On August 2, 2000, the victim stopped taking her prescription pain medication and began to experience serious withdrawal symptoms. The victim asked her daughter to call defendant for help, and she and defendant took the victim to an emergency room. The victim spent three weeks in an inpatient drug detoxification and treatment program.

The victim was released from drug treatment around August 22, 2000. On August 27 or 28, defendant called the victim and asked if he could move in with her because he had lost his job. The victim agreed that he could stay for a week, though she had no interest in rekindling the relationship. The victim went to defendant's apartment to pick up defendant and help move his clothes to the motel. Defendant stayed with the victim for the next three nights, sleeping in the motel room bed while the victim slept in the hospital bed. The victim's daughter spent nights

with a friend, but returned to the motel during the day. The victim continued to be in pain and remained partially immobile.

On August 29, 2000, defendant asked to borrow the victim's car so he could take a vinyl siding job and earn money for rent. The victim and her daughter permitted defendant's use of the car because they needed the money for rent and groceries. Defendant said he would return at 10:00 P.M., but did not return that day and the victim was unable to reach him. Defendant denied telling the victim that he would return the car that night.

Defendant returned on August 30, 2000, around 2:30 P.M. without money or groceries, smelling of alcohol. Defendant said he "messed up" or "f——ed up," which the victim and her daughter understood to mean that he had been drinking and using crack cocaine. The victim asked defendant if he had spent all his earnings on crack cocaine and alcohol; defendant admitted that he had. The victim yelled at defendant and told him to leave. Defendant became belligerent, said that he was tired of "trying to put up with [the victim's] perfect ways," squirted water in the victim's eyes, pushed her back onto the bed, and yelled at her to listen to him. Defendant threw the victim's glasses off the bed and refused to get them for her. The victim told defendant to leave, but he refused to do so. Eventually defendant and the victim calmed down, and defendant said that he really wanted to get help for his drug problem. The victim told defendant he could stay a few more days.

While they were talking, a friend of the victim's daughter came to the room and asked the victim's daughter to take her on an errand. After the victim

told her daughter that she was all right, the victim's daughter left with her friend. According to the victim, after her daughter left, defendant went to the kitchenette area and picked up a butcher knife. Defendant told the victim to undress and threatened to cut off her clothes if she refused. The victim refused, and defendant told her to "do it or else." The victim continued to refuse, but complied when defendant put the knife to her throat. Defendant then pushed the victim onto the bed on her back, grabbed her ankles, pulled her legs apart, and said, "Bitch, you've asked for this for a long time." Defendant bit the victim's breasts. The victim tried to resist and told defendant he was hurting her.

Defendant sexually penetrated the victim while she was on her back. Defendant then grabbed the victim's wrist, flipped her onto her stomach, and attempted to penetrate her anally, but was unable to completely do so. Defendant then penetrated the victim vaginally a second time to the point of ejaculation. Afterwards, the victim was shaking so hard that she could not stand. Defendant dragged the victim by her hair into the shower and washed the semen off her. The victim tried to leave the shower, but defendant held her in a chokehold and pushed her back in. While defendant was washing his hair, the victim was able to escape from the shower.

The victim's daughter returned at this point, and the victim asked her to make defendant leave. Defendant came out of the bathroom, dressed, and walked out. Defendant returned a few minutes later and banged on the window, but the victim's daughter locked the door and did not allow him to enter. The victim called the police and reported that her ex-boy-

friend had raped her at knifepoint.[1] The police arrived while defendant was still banging on the door and arrested him.

## II. ANALYSIS

### A. SPEEDY TRIAL

Defendant argues that he was denied the right to a speedy trial in violation of MCL 780.131 and MCR 6.004(D), as well as the United States Constitution and the Michigan Constitution, US Const, Am VI; Const 1963, art 1, § 20, because the trial court denied his motion to dismiss although his trial did not commence until 185 days after he was jailed. These issues raise legal questions that we review de novo. *People v Mackle*, 241 Mich App 583, 590; 617 NW2d 339 (2000).

In *People v Chavies*, 234 Mich App 274, 280; 593 NW2d 655 (1999), we held that the purpose of the statutory 180-day rule was to " 'dispose of untried charges against prison inmates so that sentences may run concurrently.' " *Id.*, quoting *People v Bell*, 209 Mich App 273, 279; 530 NW2d 167 (1995); see also MCL 780.131(1); MCR 6.004(D). Thus, the statute applies only to those defendants who, at the time of trial, are currently serving in one of our state penal institutions, and not to individuals awaiting trial in a county jail. *People v Chambers*, 439 Mich 111, 116; 479 NW2d 346 (1992); *Chavies, supra* at 280. Accord-

---

[1] Defendant admitted that he had sexual relations with the victim after her daughter left, but claimed that she consented. Defendant denied picking up a knife or threatening the victim. Defendant accused the victim of always acting "crazy" after sex, and asked her, "if you want me to leave you alone, do you want me to leave you alone now forever or just for right now?" The victim replied, "forever," and defendant walked out of the room in his pajama pants.

ingly, defendant is not entitled to relief under MCL 780.131, because he was detained in the county jail before trial.[2]

However, the federal and state constitutions and Michigan statutory law guarantee criminal defendants a speedy trial without reference to a fixed number of days. US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). When a defendant claims a violation of this right, the trial court must consider four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the right, and (4) any prejudice to the defendant. *Id.* at 112. When the delay is less than eighteen months, the defendant must prove prejudice. *Id.* In making this argument, defendant relies solely on the 180-day rule in MCL 780.131, and never attempts to demonstrate prejudice, which is essential where, as here, the delay was less than eighteen months. *Cain, supra.* Thus, there was no violation of defendant's constitutional or statutory right to a speedy trial.

### B. PROSECUTORIAL MISCONDUCT

Defendant next raises numerous instances of prosecutorial misconduct, which he claims either individually or collectively warrant a new trial. We conclude otherwise.

This Court reviews preserved claims of prosecutorial misconduct case by case, examining the remarks in context to determine whether the defendant received a fair and impartial trial. *People v Rod-*

---

[2] The same conclusion is reached under MCR 6.004(D), since that rule explicitly limits its applicability to state prisoners.

*riguez*, 251 Mich App 10, 29-30; 650 NW2d 96 (2002).
The propriety of a prosecutor's remarks depends on
all the facts of a case. *Id.*   Unpreserved claims of
prosecutorial misconduct are reviewed for plain error
affecting the defendant's substantial rights. *People v
Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000).
To avoid forfeiture of review of this issue under the
plain error rule, the defendant must demonstrate that:
(1) an error occurred, (2) the error was plain, i.e.,
clear or obvious, and (3) the plain error affected the
defendant's substantial rights. *Id.*, citing *People v
Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).
The third factor requires a showing of prejudice,
meaning that the error must have affected the out-
come of the lower court proceedings. *Schutte, supra*
at 720. If the defendant satisfies these three require-
ments, this Court must then exercise discretion in
deciding whether to reverse. *Id.* Reversal is warranted
only when the plain, forfeited error resulted in the
conviction of an actually innocent defendant, or when
an error seriously affected the fairness, integrity, or
public reputation of the judicial proceedings. *Id.*

We now turn to the specific instances of alleged
prosecutorial misconduct.

### 1. SHELLEY GEIMAN'S[3] TESTIMONY

When Geiman testified regarding the extent of the
victim's injuries, defense counsel objected to a hypo-

---

[3] When taken to the hospital, the victim had severe pain in her throat,
back, knees, wrists, and ankles. The hospital contacted Geiman, a regis-
tered nurse who worked for the Sexual Assault Nurse Examiners (SANE)
organization, affiliated with the Turning Point advocacy agency for sexual
assault victims. Geiman took the victim's history and conducted a three-
hour physical examination in accordance with SANE protocols. Geiman

thetical question posed by the prosecutor regarding hymeneal injuries to a virgin. The prosecutor asked if defense counsel had a "standing objection" to every question the prosecutor asked. Defense counsel then stated his objection, after requesting that he not be interrupted while making his objection.

Defendant argues that it was improper for the prosecutor to interrupt defense counsel's objection to the hypothetical question and openly criticize defense counsel for raising the objection. Defendant contends that the prosecutor tried to "bully" defense counsel into limiting his cross-examination and, when this failed, tried to "bully" the trial court to allow an answer to the question before the trial court ruled on the objection. This alleged error was not preserved by a timely objection, and is therefore reviewed for plain error. *Schutte, supra* at 713.

It is true that a prosecuting attorney may not personally attack defense counsel. *People v Phillips*, 217 Mich App 489, 498; 552 NW2d 487 (1996). However, the prosecutor's conduct during his exchange with defense counsel cannot reasonably be construed as a personal attack on defense counsel or an attempt to intimidate him into withdrawing the question. At worst, the prosecutor acted impatiently when he interrupted the objection and asked if defense counsel had a "standing objection" to every question. Additionally, the prosecutor did not attempt to extract an answer from the witness before the trial court had an

---

found a raised, reddened, one-centimeter patch on the victim's head where a tuft of hair had apparently been pulled out. The victim had bite marks on her breasts, bruises and tender spots on her legs, arms, and shoulders, and an abrasion on her neck. Geiman found no vaginal injuries, but stated that this was typical for a woman who has had two children.

opportunity to rule on the objection. The prosecutor's momentary expression of impatience was too fleeting and unremarkable to constitute an obvious error that denied defendant a fair trial. Furthermore, the trial court could have cured any prejudice with a curative instruction. *Schutte, supra* at 720-721.[4]

### 2. WINIFRED WILSON'S TESTIMONY

Defendant raises several arguments related to the prosecutor's conduct during the testimony of Wilson, defendant's mother. Defense counsel attempted to question Wilson about seeing the victim with defendant the day the victim went to the hospital for withdrawal symptoms, apparently in order to bolster defendant's claim that he and the victim had consensual sex on August 30, 2000. The prosecutor vehemently objected, arguing that the testimony was irrelevant and that it was an improper use of extrinsic evidence to impeach a witness on a collateral matter. The trial court excused the jury and allowed defense counsel to make an offer of proof. The proceedings became highly contentious, with the prosecutor making repeated objections and arguments, and defense counsel accusing the prosecutor of rudeness. Before the jury returned, defense counsel argued that the

---

[4] We also reject defendant's claim that the prosecutor committed misconduct by stating, "[O]ur detective can help. The detective can bring in the witness," when defendant called his first witness. Contrary to defendant's argument, it is hardly probable that a jury could or would infer from this innocuous incident that the prosecutor controlled who could testify in this case. Assuming, arguendo, that there was a potential for prejudice, the trial court could have resolved the matter by instructing the jury, upon request, that the prosecutor does not have any control over defense witnesses. Accordingly, there was no plain error. *Schutte, supra.*

prosecutor had behaved improperly throughout the trial by "bellowing" and "screaming" his objections.

Defendant emphasizes that the prosecutor disparaged defense counsel when the prosecutor declared, "I don't want another speech," just as defense counsel began to respond to the prosecutor's objection regarding the victim's hospitalization in August. This claim is reviewed for plain error on the basis of defendant's failure to make a timely objection. *Schutte, supra* at 720.

This brief expression of mild sarcasm, however, was not so prejudicial that it could have affected defendant's substantial rights. *Id.* After the prosecutor made the "speech" comment, the trial court excused the jury. Defendant then had the opportunity to make an offer of proof regarding Wilson's testimony. Consequently, the remainder of defendant's claims of prosecutorial misconduct under this subheading were made outside the presence of the jury and could not have prejudiced defendant.[5]

Defendant also argues that, in general, the prosecutor's conduct throughout the trial was improper and prejudicial. Defendant raised this argument in the trial court, outside the jury's presence, and it is, therefore, preserved error. The trial court acknowledged

---

[5] We do note, however, that the prosecutor was unduly impatient with defense counsel's attempt to make an offer of proof and extended what should have been a quick procedure. The jury had been excused for the offer of proof, so there was no cause for concern that the jury would hear anything improper. Nonetheless, the prosecutor interrupted the proceedings to such an extent that he had to be admonished by the trial court and the proceedings were unnecessarily prolonged. However, as noted, there was no prejudice from this conduct because the jury did not hear any of it, and the trial court retained control of the proceedings to allow defense counsel the opportunity to make an offer of proof and present his argument regarding admissibility.

that the prosecutor's approach had been "irritating or aggravating," and asked the parties not to be "too combative."

Despite the prosecutor's unnecessarily combative approach, defendant has not established that the cumulative effect of the alleged instances of prosecutorial misconduct deprived him of a fair trial. This Court reviews this issue to determine if the combination of alleged errors denied defendant a fair trial. *People v Knapp*, 244 Mich App 361, 387; 624 NW2d 227 (2001). The cumulative effect of several minor errors may warrant reversal even where individual errors in the case would not. *Id.* at 388. Reversal is warranted only if the effect of the errors was so seriously prejudicial that the defendant was denied a fair trial. *Id.* As discussed above, the specific instances defendant raises were too brief to prejudice him, or took place outside the jury's presence. Additionally, the trial court attempted to address defendant's concerns by instructing the prosecutor to refrain from his rather combative approach. Therefore, we find that the cumulative effect of these alleged errors did not prejudice defendant.

### C. EVIDENTIARY ISSUES

The next set of arguments presented by defendant relate to numerous evidentiary rulings made by the trial court. Before addressing these rulings individually, we first set forth the applicable standards of review.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *People v Manser*, 250 Mich App 21, 31; 645 NW2d 65 (2002).

"An abuse of discretion is found only if an unpreju-diced person, considering the facts on which the trial court acted, would say that there was no excuse for the ruling made." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). However, an issue concern-ing the proper construction of a rule of evidence presents a question of law that is reviewed de novo on appeal. *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002). An error in the admission or the exclusion of evidence is not a ground for reversal unless refusal to take this action appears inconsistent with substantial justice. MCR 2.613(A); MCL 769.26. Under this rule, reversal is required only if the error is prejudicial. *People v Mateo*, 453 Mich 203, 212 n 10; 551 NW2d 891 (1996). The defendant claiming error must show that it is more probable than not that the alleged error affected the outcome of the trial in light of the weight of the properly admitted evidence. *People v Whittaker*, 465 Mich 422, 426-427; 635 NW2d 687 (2001). As detailed below, we conclude that the evi-dentiary errors raised by defendant are either nonex-istent, or, as to those that did occur, that they were harmless.

### 1. SANE RECORDS

During trial, defendant timely objected to the admission of Geiman's written record of the victim's statements made before Geiman examined the victim. The prosecutor argued that the statements fell within the hearsay exception regarding records of a regularly conducted activity under MRE 803(6), but the trial court admitted them under MRE 803(4), as state-ments made to obtain medical treatment or diagnosis. Defendant argues that neither of these exceptions

applies and that the records were, therefore, inadmissible hearsay.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c); *Chavies, supra* at 281. Hearsay is not admissible except as provided by the rules of evidence. MRE 802; *Id.* The two exceptions at issue here are MRE 803(4) (statements made for purposes of medical treatment) and MRE 803(6) (business records).[6]

It is not clear from the trial court record whether the SANE record exhibit consisted only of the victim's statements to Geiman or whether it also contained Geiman's statements regarding her findings during the examination. Defendant's argument focuses on the victim's statements that defendant forced her to have sex. The prosecutor's argument speaks of Geiman's

---

[6] Not excluded by the hearsay rule are the following:

Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment. [MRE 803(4).]

A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. [MRE 803(6).]

observations. To the extent the record contains statements of Geiman's observations, MRE 803(4) would not apply because statements were not made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history.

Defendant's only argument regarding the business record exception is that Geiman was not the custodian of the records. This argument is without merit because MRE 803(6) plainly states that a memorandum or report can be admitted if "the testimony of the custodian *or other qualified witness*" shows that it was made and kept as a regular practice of the business. The plain language of MRE 803(6), therefore, defeats defendant's argument that the custodian of the records must testify in order to establish that the requirements of the business record exception are satisfied. Consequently, the trial court could have correctly admitted the evidence under MRE 803(6).[7]

### 2. PRIOR CONSENSUAL SEXUAL ACTIVITY

Defendant also argues that the trial court erred in excluding testimony of prior consensual sexual relations between the victim and himself. Defendant

---

[7] To the extent the court admitted statements in the record wherein the victim identified defendant as her rapist, any error committed was harmless. First, although the trial court relied on MRE 803(4), and not on MRE 803(6), this Court will not reverse a trial court's order if it reached the right result for the wrong reason. *People v Goold*, 241 Mich App 333, 342 n 3; 615 NW2d 794 (2000). Additionally, any error would be harmless because the victim's statements to Geiman that defendant raped her were cumulative to the victim's own testimony. *People v Crump*, 216 Mich App 210, 212; 549 NW2d 36 (1996); *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996).

argues that he was not required to give notice that he intended to introduce this evidence.

MCL 750.520j(1)(a) (known as the rape-shield statute) provides that "[e]vidence of specific instances of the victim's sexual conduct [with the defendant] . . . shall not be admitted . . . unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." MCL 750.520j(2), however, contains a specific notice provision applicable to a defendant who wishes to admit evidence of the kind described under subsection 1:

> If the defendant proposes to offer evidence described in subsection (1)(a) or (b), the defendant within 10 days after the arraignment on the information shall file a written motion and offer of proof. The court may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1). If new information is discovered during the course of the trial that may make the evidence described in subsection (1)(a) or (b) admissible, the judge may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1).

Defendant argues that the notice requirement of MCL 750.520j(2) did not preclude him from cross-examining the victim regarding prior consensual relations between the victim and defendant. Defendant relies on *Michigan v Lucas*, 500 US 145; 111 S Ct 1743; 114 L Ed 2d 205 (1991), and related decisions of this Court.

In *Lucas*, the United States Supreme Court concluded that the notice requirement of MCL 750.520j(2) enabled a prosecutor to interview persons and other-

wise investigate whether a prior relationship really existed. When a complainant conceded a prior sexual relationship, the statutory procedure allowed a trial court to determine, before trial, whether evidence of the relationship was material to a fact at issue in the case or whether the inflammatory or prejudicial nature of the evidence outweighed its probative value. *Id.* The Court then determined that the notice requirements and preclusion sanctions within MCL 750.520j(2) were permissible because they "serve[] legitimate state interests in protecting against surprise, harassment, and undue delay." *Lucas, supra* at 152-153. The Court did not consider whether preclusion was justified in *Lucas,* but remanded to this Court to address whether preclusion violated the defendant's Sixth Amendment rights. *Id.* at 153.

On remand, we determined that when a defendant seeks to submit evidence of prior consensual relations between himself and a complainant pursuant to MCL 750.520j(1)(b), failure to give notice does not automatically preclude admission of the evidence. In this situation, the trial court must exercise its discretion, on a case-by-case basis, to determine whether the evidence should be admitted or excluded. In making this decision, the trial court should consider that the purpose of the rape-shield statute is to protect rape victims from surprise, harassment, unnecessary invasions of privacy, and undue delay. Protracted delay in raising the evidence, especially by waiting until the start of trial, suggests wilful misconduct to create a tactical advantage, and weighs in favor of exclusion. *People v Lucas (On Remand),* 193 Mich App 298, 301-302; 484 NW2d 685 (1992); see also *Peo-*

*ple v Lucas (After Remand)*, 201 Mich App 717, 719; 507 NW2d 5 (1993).

Here, the trial court erred by excluding the evidence solely on the basis of defendant's failure to give notice, without exercising its discretion in light of the particular circumstances of the case. However, defendant's offer of proof provides enough information on the record for us to determine that the admission of evidence of sexual relations before the victim's injury and surgery clearly would not serve any legitimate purpose. The evidence established that the victim had been sexually active with defendant before her injury and before she terminated their relationship. The jury knew that defendant and the victim lived together and had a romantic relationship, and the prosecutor acknowledged in his closing argument that August 30, 2000, was not the first time the victim and defendant had sex. The admission of evidence that their consensual sexual relationship included anal intercourse also would not serve any proper purpose. This salacious detail has only the most tenuous connection to the question of the victim's consent on August 30, but has great potential for embarrassment, harassment, and unnecessary intrusion into privacy. *Lucas (On Remand), supra* at 302-303.

On the other hand, evidence that the victim consented to sex with defendant after her injury and surgery would have served a legitimate purpose. The victim's credibility was enhanced by evidence that she was in severe discomfort after her surgery and by her testimony that she ended her relationship with defendant in May. The victim specifically testified that she did not have consensual sexual relations with anyone after surgery because she felt too sore. These circum-

stances made it less likely that she would engage in consensual sex with defendant, as the prosecutor argued in closing. Evidence that the victim was having consensual sex with defendant despite these circumstances would, therefore, have bolstered defendant's defense.

Nonetheless, the exclusion of the evidence was harmless error. Defendant testified that he and the victim remained a couple throughout the summer of 2000. Defendant was also able to provide testimony about having sexual relations with the victim during this time. This testimony strongly suggested that the victim remained sexually enthusiastic despite her injury. Defendant further testified that the victim helped him move his luggage when he moved into the motel with her, despite her back pain, and added, "[The victim] did a lot of things her doctor ordered her not to do." Although this was not the sort of explicit evidence defendant hoped to get before the jury, it was sufficient to alert the jury that defendant maintained that he and the victim remained sexually involved despite her back injury and their troubled relationship.

Further, defendant's interest in producing the evidence must be balanced against the prosecution's interest in avoiding surprise. Defendant's protracted delay in offering the evidence suggested "wilful misconduct designed to create a tactical advantage" that weighed in favor of exclusion. *Id.* In light of these balanced interests, defendant was not unduly prejudiced when he was prohibited from introducing explicit evidence and had to rely on oblique references. Under these circumstances, we conclude that the trial court's failure to exercise its discretion was

harmless error, and the exclusion of the evidence, if erroneous, was also harmless.[8]

### 3. GEIMAN'S EXPERT TESTIMONY

Defendant next argues that the trial court erred in permitting Geiman to testify as an expert, over his objection, because the prosecutor failed to designate her as an expert during pretrial discovery. A trial court's decision to allow testimony by a nonendorsed witness is reviewed for an abuse of discretion. *People v Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992).

MCR 6.201(A)(1) provides that, upon request, a party must provide the names and addresses of all lay and expert witnesses whom the party intends to call at trial. The prosecutor argues that this rule does not require designation of expert witnesses.

Although we are inclined to reject defendant's argument because MCR 6.201(A) does not explicitly require *designation* of expert and lay witnesses, we need not decide that issue because any error in permitting Geiman to testify as an expert was harmless. MRE 701 permits lay witnesses to testify about opinions and inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Geiman's testimony related to her observations and findings during the

---

[8] We decline to address defendant's argument that he should have been able to elicit testimony from Edythe Moore regarding her and Reverend Moore's counseling of defendant and the victim. Rather than arguing against the prosecution's privilege objection, defense counsel moved into another line of questioning, thus forgoing any decision by the trial court on the prosecutor's objection.

examination of the victim, and was almost entirely within these limitations. MRE 702 allows qualified experts to testify about "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." The only statements from Geiman's testimony that could be construed as "specialized knowledge" was her testimony that the victim's physical state (bruises, torn hair) and demeanor (anxious, upset) were consistent with a recent rape and with the history that the victim gave. These opinions do not involve highly specialized knowledge, and are largely based on common sense. See *Leavesly v Detroit*, 96 Mich App 92, 94; 292 NW2d 491 (1980), mod 409 Mich 926 (1980).

Geiman's testimony that vaginal injuries are unusual in rape, especially in a mature woman who has given birth, was the only testimony that might be construed as specialized information not commonly known. *Id.* However, any error is harmless because it is highly improbable that this brief testimony would have been the deciding factor in how the jury resolved the credibility contest. Defendant never argued that the absence of vaginal injury undermined the victim's credibility. Additionally, defendant has not explained how he would have been better prepared to respond to this evidence simply by knowing before trial that Geiman would be offered as an expert witness. After all, Geiman's testimony would not have been a surprise because defendant knew that she was going to testify, and defendant could have reasonably predicted that she would testify about her findings during the victim's examinations. Therefore, we conclude that defendant is not entitled

to a new trial on the basis of the prosecutor's failure to designate Geiman as an expert witness.[9]

### 4. EXCITED UTTERANCE

Defendant next challenges the trial court's decision to admit a police officer's testimony regarding what the victim told him at the scene of the crime. Over objection, the testimony was admitted under the excited utterance exception to the hearsay rule. See MRE 803(2).

MRE 803(2) provides an exception to the hearsay rule for a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "The rule allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the 'sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy.' " *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998), quoting 5 Weinstein, Evidence (2d ed), § 803.04[1], p 803-19. The pertinent inquiry is not

---

[9] During the direct examination of Geiman, the prosecutor asked a hypothetical question regarding injuries to the hymen of a virgin. Defense counsel objected to this question and also to the preceding question regarding hymeneal injuries to a woman not a virgin on grounds of relevancy and the lack of a foundation for the questions. On appeal, defendant argues that the question was improper because it posed a hypothetical question without a foundation. Contrary to defendant's argument, the purpose of this question was not to suggest that the victim was a virgin, since the prosecutor freely admitted she was not a virgin and had given birth to two children. It seems clear to us that this question was instead intended to put the evidence in context. Because the question was not intended to portray the victim as a virgin, there was no need to establish a foundation that she was a virgin.

whether there has been time for the declarant to fabricate a statement, but whether the declarant is so overwhelmed that she lacks the capacity to fabricate. *Id.* at 551.

Before repeating the victim's statement that defendant had assaulter her, Officer John Marginean, one of the officers who responded to the victim's call to the police, testified that the victim appeared extremely upset or "frantic," and was having trouble breathing and speaking. Marginean also stated that he arrived within a minute or two of the victim's call. This testimony was consistent with that of the victim's daughter, who likewise testified that the victim was extremely upset and shaking at the time she called the police. Therefore, it can reasonably be inferred that the rape was the cause of the victim's stress, and that she was still under the influence of the stress when she made the statement. We reject defendant's argument that there was "no foundation made as to whether the statement had been triggered by the stress of the alleged sexual attack or by the stress of the police questioning," because the lapse of time between the alleged assault and the victim's statement was brief and there was no evidence that Marginean questioned the victim. The statement was, therefore, properly admitted under MRE 803(2).

### 5. GLEMIE BEASLEY

Defendant next contends that the trial court improperly allowed the prosecutor to question defense witness Beasley about religion. Specifically, on direct examination, Beasley testified that he knew defendant from church activities and a church singing group, and opined that defendant was not a violent

man. On cross-examination, the prosecutor questioned Beasley regarding the spiritual component of the church singing group, and asked Beasley if he believed in God and in doing "the right thing." The prosecutor then asked Beasley if he agreed that spiritual people wanted to "do the right thing" and did not "want to harm people," and asked him if he considered a person to be spiritual if the person stole from his girlfriend and her daughter and used the proceeds to purchase crack cocaine. Beasley responded affirmatively to the first question, but negatively to the second question.

Defendant contends that MCL 600.1436 prohibits the questioning of a witness regarding his religious beliefs. We conclude that this unpreserved issue does not require reversal. *Carines, supra.*

MCL 600.1436 provides, "No person may be deemed incompetent as a witness, in any court, matter or proceeding, on account of his opinions on the subject of religion. No witness may be questioned in relation to his opinions on religion, either before or after he is sworn." Additionally, MRE 610 provides, "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."

Defendant relies on *People v Bouchee*, 400 Mich 253; 253 NW2d 626 (1977), where our Supreme Court held that a trial court's questions about Biblical beliefs and adulterous behavior[10] constituted an inquiry into the defendant's religious beliefs, which

---

[10] Specifically, the trial court asked the defendant, who was on trial for assault with intent to commit rape, whether his belief in the Bible would prevent him from having an adulterous relationship. *Id.* at 258 n 3. There-

was forbidden by the statute. *Id.* at 262. The Court held that the prosecutor or the trial court could not "inquire of the defendant concerning the nature, substance and content of his religious beliefs in order to show that such beliefs were inconsistent with the qualities of good character claimed." *Id.* "Aside from the debatable relevance of such an inquiry to rebut the claim of a moral, God-fearing and religious character, such questioning is expressly forbidden by the statute and our holding in [*People v*] *Hall* [391 Mich 175; 215 NW2d 166 (1974)]." *Id.* at 263.

The Supreme Court also held that the prosecutor violated the defendant's rights by questioning the defendant's main character witness about the defendant's religious beliefs. *Id.* at 263-264. The Court noted that the statute prohibits only questioning a witness about his own beliefs, but held that it would extend the rule to prohibit questioning one witness about another witness's beliefs. *Id.*[11] Although the defendant failed to preserve the issue by raising a timely objection, the Supreme Court reversed his convictions. *Id.* at 263 n 4, 264-265. See also *Hall, supra* at 180-183.

Here, the prosecutor's questioning of Beasley was contrary to the statutory prohibition as interpreted by *Bouchee* against questioning a witness "in relation to

---

after, the prosecutor questioned the defendant's minister with regard to whether the defendant was a religious man. *Id.*

[11] In its ruling, the Court acknowledged that the "statutory prohibition only precludes questioning a witness concerning his own religious beliefs . . . ." *Id.* at 264. Despite the clear limiting language of the statute, the Court extended the rationale to questioning one witness about another witnesses' religious beliefs. *Id.* We are bound to follow the decisions of our Supreme Court until they are reversed. *People v Beasley*, 239 Mich App 548, 559; 609 NW2d 581 (2000).

his opinions on religion." MCL 600.1436. While the questions did not actually delve into the substance of Beasley's or anyone else's religious beliefs, they were clearly meant to elicit a discrepancy between defendant's purported spirituality and his conduct of theft and drug use, similar to the trial court's questions in *Bouchee, supra* at 261, that inquired into the discrepancy between the defendant's belief in the Bible and his openness toward adultery.

Although *Bouchee* and *Hall* held that a violation of MCL 600.1436 requires reversal regardless of preservation, those cases are distinguishable from the instant case because they involved inquiry into the *defendant's* religious beliefs. The *Hall* Court emphasized that "[a] *defendant* is entitled to a trial free of such improper questions. Once the question is asked, this is no longer possible." *Hall, supra* at 182-183 (emphasis added). Consistent with this principle, the Court in *People v Leonard*, 224 Mich App 569, 594-595; 569 NW2d 663 (1997), found no error requiring reversal where the prosecutor's arguably improper questions did not result in revelation of the defendant's religious beliefs.

In the instant case, the prosecutor did not ask questions regarding *defendant's* religious beliefs and defendant's behavior. Instead, the prosecutor raised an inconsistency between *Beasley's* religious beliefs and defendant's behavior in order to challenge *Beasley's* opinion that defendant was a spiritual man. Although Beasley also testified that defendant was involved in "church events, praising God," this was in response to defense counsel's question. The prosecutor's questions did not bring defendant's religious

opinions under the jury's scrutiny; thus, the concerns present in *Hall* and *Bouchee* are not present here.

Despite the prosecutor's error, reversal is not warranted on the basis of this unpreserved error unless defendant can establish that his substantial rights were affected. *Carines, supra.* We do not believe that the improper questioning of Beasley affected defendant's substantial rights. Beasley was a relatively unimportant witness in this trial. Beasley's only material contribution was his testimony that he knew defendant from their involvement in church activities, and his opinion that defendant was not a violent man. Aside from the questions regarding Beasley's opinions on spirituality, the prosecutor's cross-examination was permissible. The prosecutor sought to undermine Beasley's opinion of defendant's character by showing that Beasley, who had only known defendant for a year, knew nothing about defendant's drug use. In the broader context of the entire trial, the questions regarding Beasley's religious opinions were a minor incident in the examination of a minor witness, and were too insignificant to deprive defendant of a fair trial.

### 6. POVERTY

Defendant also argues that the prosecutor improperly challenged defendant's claim that the victim falsely accused him of rape, by questioning defendant about the victim's lack of any pecuniary gain in claiming defendant raped her, and arguing to that effect during closing. Defendant claims these arguments were improper because evidence of poverty and

unemployment is either irrelevant or of marginal probative value.[12]

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; *Aldrich, supra* at 101. Generally, all relevant evidence is admissible, unless otherwise provided by law, and evidence that is not relevant is not admissible. MRE 402; *Aldrich, supra.* Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403; *Aldrich, supra.*

Our Supreme Court held in *People v Henderson*, 408 Mich 56, 66; 289 NW2d 376 (1980):

> Evidence of poverty, dependence on public welfare, unemployment, underemployment, low paying or marginal employment, is not admissible to show motive. The probative value of such evidence is diminished because it applies to too large a segment of the total population. Its prejudicial impact, though, is high. There is a risk that it will cause jurors to view a defendant as a "bad man"—a poor provider, a worthless individual.
>
> Other evidence of financial condition may, however, be admissible in the circumstances of a particular case.

In *Henderson*, the defendant in an embezzlement case had a good job, but was experiencing temporary financial problems. *Id.* at 65-66. The Court held that,

---

[12] The issue is unpreserved since defendant did not object to this questioning or argument at trial.

in such circumstances, evidence of temporary financial trouble was relevant to show that the defendant had a motive to commit the embezzlement; otherwise, the jury might wonder why the defendant would risk losing his job by stealing from his employer. *Id.* at 66-67. The Court distinguished the case from a situation where evidence of chronic money problems is used to show motive for a theft crime, because in the specific circumstances of the *Henderson* defendant's case, the motive for the theft offense required an explanation. *Id.* at 67.

In the instant case, the prosecutor did not attempt to show that defendant's precarious financial condition was a motive for committing the crime, or that it made him more prone to commit a rape. Although this case is not factually analogous to *Henderson*, it is similar in that the prosecutor had a particular reason to introduce the financial evidence, rather than to merely portray defendant as a financially worthless individual. Here, the evidence was relevant because it related to defendant's argument that the victim falsely accused him. The prosecutor challenged this argument by eliminating all likely motives to bring a false rape charge, including the absence of a financial motive to falsely accuse defendant. Similarly, the prosecutor's closing statements were relevant to the theory that the victim had no motive to falsely accuse defendant.

Additionally, evidence of defendant's financial, housing, and employment situation were relevant to the prosecution's theory of the case. The prosecutor sought to show that the victim's relationship with defendant had completely deteriorated by August 30, 2000, because defendant persisted in using drugs,

although his drug abuse was ruining his life. This culminated on August 30, when defendant returned to the apartment and indicated that he had spent all his money on drugs and that there was no money to help the victim with rent. Thereafter, the argument between the victim and defendant occurred, ending with defendant raping her. Hence, comments about defendant's condition were not intended to malign defendant's character, or to urge the jury to convict him out of contempt, but rather were to explain the change in the relationship between defendant and the victim from a romantic liaison to a violent assault.

Moreover, the prejudicial effect of these questions and comments did not outweigh their probative value. Even without the prosecutor's direct question regarding defendant's assets, it could be inferred that defendant's financial condition was marginal because he was living with the victim in a motel efficiency unit and relying on odd jobs for income. Additionally, the evidence showed that the victim's situation was not much better. The prosecutor commented that the victim had little money and was living in a cheap motel. Under these circumstances, there was no undue prejudice from the questions and comments regarding defendant's monetary situation.

In sum, each of the alleged evidentiary errors is either without merit or harmless. Accordingly, defendant is not entitled to reversal on the basis of any of these claimed errors.

### D. INTOXICATION DEFENSE

Defendant argued below, and continues to assert before this Court, that the trial court erred in reading,

at the prosecutor's request, a standard jury instruction informing the jury that voluntary intoxication is not a defense to first-degree criminal sexual conduct. This Court reviews jury instructions as a whole to determine if the trial court made an error requiring reversal. *People v Katt*, 248 Mich App 282, 310; 639 NW2d 815 (2001). Even if somewhat imperfect, jury instructions are not erroneous if they fairly present the issues for trial and sufficiently protect the defendant's rights. *Id.* After a review of the record, we conclude that the trial court did not err because the facts supported the instruction.

Defendant claims that the trial court should not have given CJI2d 6.1, which provides, "There has been some evidence that the defendant was voluntarily intoxicated with alcohol or drugs when the alleged crime was committed. Voluntary intoxication is not a defense to [criminal sexual conduct]. So it does not excuse the defendant if [he] committed this crime." Although defendant did not raise an intoxication defense and, in fact, denied using drugs, the instruction was necessary to ensure that the jury did not allow defendant's possible voluntary intoxication to relieve defendant of any criminal responsibility. As noted above, during trial, the prosecutor introduced much evidence that defendant had a chronic drug abuse problem, and that he used drugs and alcohol between the time he borrowed the car and returned to the motel room. The prosecution also introduced evidence of defendant's drug use to undermine character witness testimony that defendant was not a violent man—either to suggest that the witnesses were not well acquainted with defendant, or to provide an

explanation with regard to why a seemingly nonviolent man might become violent.

While the evidence did not directly establish that defendant was intoxicated at the time of the rape, the jury could have inferred this from the evidence that he had an ongoing drug problem and that he spent all his money on drugs in the hours preceding the crime. Consequently, the prosecution had legitimate cause to be concerned that the jury might believe that defendant was intoxicated at the time of the rape and erroneously conclude that he was not legally accountable for his actions. The jury instruction was, therefore, relevant to the evidence, and the trial court did not err in giving it.

### E. SENTENCING ISSUES

Defendant raises two sentencing issues, one dealing with the proportionality of his sentence, the other raising a perceived statutory error. We address these issues, neither of which is meritorious.

### 1. PROPORTIONALITY

Defendant contends that, in light of his background and community support and involvement, his sentence of nine to twenty-five years' imprisonment is disproportionate to the offense. Defendant also contends that his sentence constitutes cruel and unusual punishment under the constitution.

MCL 769.34(10) provides limited grounds (error in scoring of the guidelines or reliance on erroneous information) for appealing a sentence within the statutory guidelines, and requires a defendant to raise grounds for objection either at the time of sentencing

or in a motion for resentencing. MCL 769.34(10) partially conflicts with MCR 6.429(C), which does not permit a defendant to preserve a sentencing issue in a motion for resentencing, and instead provides that a defendant may not raise the issue on appeal unless he "raised the issue at or before sentencing or demonstrates that the challenge was brought as soon as the inaccuracy could reasonably have been discovered." See *People v McGuffey*, 251 Mich App 155, 165; 649 NW2d 801 (2002). Because the court rule pertains to practice and procedure, it takes precedence over the statute. *Id.* at 165-166. In any event, this Court has decided that even an unpreserved sentencing error can be reviewed under the plain error rule of *Carines, supra*. *People v Kimble*, 252 Mich App 269, 277-278; 651 NW2d 798 (2002), lv gtd 468 Mich 870 (2003). Here, although defendant objected to the trial court's scoring of offense variable (OV) 11, he did not raise the proportionality issue he now raises. Accordingly, this issue is reviewed for plain error.

When the minimum sentence is within the range provided by the statutory sentencing guidelines,[13] this Court must affirm unless the trial court erred in scoring the guidelines or relied on inaccurate information. MCL 769.34(10); *People v Leversee*, 243 Mich App 337, 348; 622 NW2d 325 (2000). Except as otherwise provided in the statute, MCL 769.34 requires that the trial court impose a sentence within the guidelines range, but permits departures from the guidelines for substantial and compelling reasons. MCL 769.34(2)-(3);

---

[13] Because the offenses occurred after January 1, 1999, the trial court was required to apply the statutory sentencing guidelines in MCL 769.31 *et seq.*, and MCL 777.1 *et seq.* MCL 769.34(2); *People v Hegwood*, 465 Mich 432, 438-439; 636 NW2d 127 (2001).

*People v Hegwood*, 465 Mich 432, 438; 636 NW2d 127 (2001).

As defendant recognizes, his minimum sentence of nine years was at the low end of the sentencing guidelines range for his offense. MCL 777.62. Accordingly, defendant's argument is without merit because of the statutory limitation on appellate review of sentences. MCL 769.34(10). *People v Babcock*, 469 Mich 247; 666 NW2d 231 (2003). Consequently, defendant's proportionality claim is outside the limited scope of review provided for by the statute.[14]

### 2. SCORING OF OV 11

Defendant's final argument is that the trial court erroneously scored fifty points for OV 11. According to defendant, the variable should have been scored at zero points because under MCL 777.41(2)(c) each of the three sexual penetrations was the basis of a separate charge and, therefore, was not subject to scoring. We disagree.

This Court reviews a sentencing court's scoring decision to determine whether the trial court properly exercised its discretion and whether the record evidence adequately supports a particular score. See *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002). However, this issue also entails a question of statutory interpretation, which is reviewed de novo. *People v Schaub*, 254 Mich App 110, 114-115; 656 NW2d 824 (2002).

---

[14] Contrary to defendant's argument, the trial court was not obligated to advise defendant of his rights under MCL 769.34(7). As discussed above, the trial court did not impose on defendant a minimum sentence in excess of the guidelines range. Accordingly, MCL 769.34(7) is inapplicable, and there was no basis for the trial court to advise defendant of these rights.

MCL 777.41 provides:

(1) Offense variable 11 is criminal sexual penetration. Score offense variable 11 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) Two or more criminal sexual penetrations occurred.......... 50 points
(b) One criminal sexual penetration occurred..................... 25 points
(c) No criminal sexual penetration occurred ...................... 0 points

(2) All of the following apply to scoring offense variable 11:

(a) Score all sexual penetrations of the victim by the offender arising out of the sentencing offense.

(b) Multiple sexual penetrations of the victim by the offender extending beyond the sentencing offense may be scored in offense variables 12 or 13.

(c) Do not score points for the 1 penetration that forms the basis of a first- or third-degree criminal sexual conduct offense.

The victim testified that defendant sexually penetrated her three times, correlating to defendant's charges and convictions on three counts of first-degree CSC. For each conviction, the trial court scored OV 11 at fifty points on the basis of the two acts of criminal sexual penetration that formed the basis of the other two convictions. Specifically, defendant contends that the scoring was erroneous because subsection 41(2)(c) prohibits a scoring of points for the penetration that forms the basis of an offense.

Analysis of this issue requires interpretation of the statutory sentencing guidelines. The primary goal of statutory construction is to give effect to the intent of the Legislature. *People v Stone*, 463 Mich 558, 562; 621 NW2d 702 (2001). If the language of the statute is unambiguous, judicial construction is not permitted because the Legislature is presumed to have intended

the meaning it plainly expressed. *Id.* Judicial construction is appropriate, however, if reasonable minds can differ concerning the meaning of a statute. *People v Warren*, 462 Mich 415, 427; 615 NW2d 691 (2000). Where ambiguity exists, this Court seeks to effectuate the Legislature's intent by applying a reasonable construction based on the purpose of the statute and the object sought to be accomplished. *People v Disimone*, 251 Mich App 605, 609; 650 NW2d 436 (2002). "The court must look to the object of the statute, the harm it is designed to remedy, and apply a reasonable construction that best accomplishes the purpose of the statute." *People v Williams*, 236 Mich App 610, 613; 601 NW2d 138 (1999). In construing a statute, the statutory provisions must be read in the context of the entire statute in order to produce a harmonious whole; courts must avoid a construction that would render statutory language nugatory. *Id.* A statute that is unambiguous on its face may be rendered ambiguous by its interaction with, and its relation to, other statutes. *People v Valentin*, 457 Mich 1, 6; 577 NW2d 73 (1998).

Under the statute, fifty points are assigned if two or more criminal sexual penetrations[15] occurred. MCL 777.41(1)(a). The statute also provides that twenty-five points should be assigned for one criminal sexual penetration and that no points should be assigned if no criminal sexual penetration occurred. MCL 777.41(1)(b)-(c).

---

[15] Although "criminal sexual penetration" is not defined under the statutory sentencing guidelines, it is defined in the Michigan penal code under MCL 750.520a(o) as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required."

While the language of subsection 41(1) is unambiguous, subsection 41(2), which provides instructions for scoring OV 11, is ambiguous. First, subsection 41(2)(a) instructs the sentencing court to "[s]core *all* sexual penetrations of the victim by the offender arising out of the sentencing offense." (Emphasis added.) Because "arising out of" the sentencing offense refers to all penetrations arising out of the entire assault, *People v Mutchie*, 251 Mich App 273, 276; 650 NW2d 733 (2002),[16] in this case all three penetrations are eligible for scoring under subsection 41(2)(a). However, this subsection must be read in context with subsection 41(2)(c), which instructs, "Do not score points for *the* 1 penetration that forms the basis of *a* first- or third-degree criminal sexual conduct offense." (Emphasis added.)[17]

Defendant argues that the plain and unambiguous language of subsection c precluded the trial court from scoring points for the other two penetrations, since they were "the one penetration" that formed the

---

[16] On appeal from this Court, the Michigan Supreme Court determined that this Court's analysis of OV 11 was dicta. *People v Mutchie*, 468 Mich 50, 52; 658 NW2d 154 (2003). Although the analysis was dicta, we nonetheless find it persuasive with respect to this issue.

[17] Pursuant to subsection 41(2)(b), "[m]ultiple sexual penetrations of the victim by the offender extending beyond the sentencing offense may be scored in offense variables 12 or 13." Offense variables 12 (contemporaneous felonious criminal acts) and 13 (continuing pattern of criminal behavior) are inapplicable to the instant case. First, OV 12 does not apply because this offense variable applies only to a contemporaneous act that occurred within twenty-four hours of the sentencing offense if that act "has not and will not result in a separate conviction." MCL 777.42(2)(a)(ii). Here, the multiple penetrations for which defendant was convicted did, in fact, result in separate convictions, which automatically removes the offenses from consideration under this subsection. Additionally, OV 13 is inapplicable because there is no contention or evidence that defendant's acts constituted a pattern of continuing criminal behavior. MCL 777.43. Hence, only subsections 41(2)(a) and (c) apply to this case.

basis of "a" first-degree CSC offense. We do not believe that defendant's reading of the statute is the only reasonable interpretation. For example, an alternative reasonable construction of this provision is as follows. Although subsection c indicates that a trial court should not score "the one" penetration that forms the basis of "a" first- or third-degree CSC offense, a fair reading of the statute is that "a" does not mean "any," but instead refers to the fact that "the one penetration" exclusion applies to either "a" first-degree or "a" third-degree CSC offense. Moreover, defendant's proffered interpretation ignores that the Legislature's use of "the one penetration" phrase narrows the exclusion to *the* penetration that was the basis of the offense for which the sentence is being imposed. Thus, we believe that subsection 41(2)(c) is ambiguous, as it is capable of more than one reasonable interpretation. *Warren, supra.*

A panel of our Court likewise found this section ambiguous in *Mutchie, supra,* and set forth the most reasonable construction of the statute consistent with the Legislature's intent:

> MCL 777.41(2)(c) states: "Do not score points for the 1 penetration that forms the basis of a first- or third-degree criminal sexual conduct offense." This instruction is arguably ambiguous, that is, subject to reasonable disagreement over its meaning, *People v Adair*, 452 Mich 473, 479; 550 NW2d 505 (1996), because it does not specify whether the CSC offense that is not scored is the sentencing offense. However, construing MCL 777.41(2)(c) as excluding all sexual penetrations that form the basis of a first-degree or third-degree CSC offense would be unreasonable because it would, in effect, render any score for sexual penetrations nugatory. This is so because first-degree and third-degree CSC are the offenses that require sexual penetration as an element. MCL 750.520b and MCL 750.520d. "When constru-

ing a statute, the court must presume that every word has some meaning and avoid any construction that would render any part of the statute surplusage or nugatory." *People v Borchard-Ruhland*, 460 Mich 278, 285; 597 NW2d 1 (1999).

Therefore, MCL 777.41(2)(c) must be construed in a more limited context as operating either to exclude any sexual penetrations resulting in separate convictions, as suggested by defendant, or to exclude the use of one sexual penetration when the sentencing offense itself is first-degree CSC or third-degree CSC, as suggested by the prosecutor. We find that the latter position represents the more reasonable view of legislative intent because the language of MCL 777.41(2)(c) indicates an intent to exclude only one sexual penetration. [*Id.* at 279-280.]

We agree with the *Mutchie* panel and find that the proper interpretation of OV 11 requires the trial court to exclude the one penetration forming the basis of the offense when the sentencing offense itself is first-degree or third-degree CSC. Under this interpretation, trial courts may assign points under subsection 41(2)(a) for "all sexual penetrations of the victim by the offender arising out of the sentencing offense," while complying with the mandate of subsection 41(2)(c), by not scoring points for *the one penetration* that forms the basis of a first- or third-degree CSC offense. Accordingly, trial courts are prohibited from assigning points for the one penetration that forms the basis of a first- or third-degree CSC offense that constitutes the sentencing offense, but are directed to score points for penetrations that did not form the basis of the sentencing offense.

In reaching this conclusion, it is important to note that under defendant's interpretation, the trial court would be prohibited from assigning points for the one penetration that forms the basis of *any* first- or third-

degree CSC conviction. Thus, in a case such as this, involving multiple penetrations that were each separately charged, the trial court would be required to assign an offender zero points under OV 11 because each single penetration would be the basis of a first-degree CSC charge.[18] Defendant's interpretation would also encourage departures from the statutory sentencing guidelines because no other variable accounts for multiple convictions involving criminal sexual penetrations that do not give rise to a continuing pattern of criminal behavior. See *Babcock, supra* at 267 n 21, citing 1994 PA 445, § 33(1)(e)(iv) (indicating that the purpose of the statutory sentencing guidelines is to reduce the frequency of sentencing deviations). Finally, had the Legislature intended that only sexual penetrations not resulting in a criminal charge be considered, it could have stated that intent. See MCL 777.42(2)(a)(ii) (applicable only to a contemporaneous felonious act that "has not and will not result in a separate conviction.") In the absence of such limiting language in MCL 777.42, we will not read a similar limitation into that section.

Also worthy of note is that subsections 41(2)(a) and (c) closely resemble the language found in the previously utilized judicial sentencing guidelines.[19] Although not identical, the similarities between the statute and the prior judicial sentencing guidelines further support our conclusion that this interpretation

---

[18] By definition, first- and third-degree CSC require at least one sexual penetration. MCL 750.520b; MCL 750.520d.

[19] Under the judicial sentencing guidelines, OV 12 instructed the trial court to "[s]core all penetrations involving the offender arising out of the same criminal transaction," and that "[i]n CSC 1st and CSC 3rd[,] do not score the one penetration that forms the basis of the conviction offense." Michigan Sentencing Guidelines (2d ed, 1988), p 45.

of OV 11 fully effectuates the Legislature's intent. See *People v Cotton*, 209 Mich App 82, 83-84; 530 NW2d 495 (1995) (court interpreted the counterpart of OV 11 in the judicial sentencing guidelines to permit scoring of an act of penetration for a different penetration, even if it resulted in a separate conviction). Accordingly, the trial court properly assigned fifty points for the two penetrations that constituted the basis of defendant's other convictions.

Affirmed.