PEOPLE v DROHAN

Docket No. 249995. Submitted October 5, 2004, at Detroit. Decided
October 12, 2004, at 9:00 a.m. Leave to appeal sought.

Joseph E. Drohan was convicted by a jury in the Oakland Circuit
Court, Deborah G. Tyner, J., of criminal sexual conduct in the third
and fourth degrees (CSC III and CSC IV) and was sentenced to 127
months to thirty years of imprisonment for CSC III and one to four
years of imprisonment for CSC IV. The court had admitted
testimony relating to several similar incidents against other simi-
lar victims as being relevant to show the existence of a scheme,
plan, or method by which the defendant accomplished the sexual
assaults because consent was an issue. MRE 404 (other-acts
evidence). The defendant, on appeal, objected to the admission of
that evidence and argued that there was insufficient evidence
presented to support the convictions because victim testimony was
uncorroborated, that the scoring of offense variables relating to
psychological damage to the victim and exploitation of a vulner-
able victim were scored improperly resulting in an excessive
sentencing guidelines range for the CSC III conviction, and that
his sentence for the CSC III conviction violates constitutional
prohibitions against cruel or unusual punishment.

The Court of Appeals held:

1. The testimony of other victims of similar, but uncharged,
offenses committed by the defendant was relevant under a permis-
sible theory of logical relevance, that is, to suggest to the jury that
it was more likely that the defendant committed the charged
assaults because he used his common system in committing them.
The danger of unfair prejudice did not substantially outweigh the
probative value of the evidence. The trial court gave a limiting
instruction to the jury regarding for what uses it could consider
the other-acts evidence. Because the trial court determined that
uncharged offenses, which in this case included an uncharged
offense that contained a different element along with the other
similar elements, contained sufficient features common to the
charged offenses, the court did not abuse its discretion in admit-
ting the evidence after consideration of the strictures of MRE 404
and providing the jury with a limiting jury instruction.

2. The sufficiency of the evidence is adjudged by viewing the evidence in a light most favorable to the prosecution and determining from that view whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. In this case the victim's testimony was not corroborated, but there is no requirement that the testimony be corroborated, MCL 750.520h. The jury had the opportunity to assess the credibility of the testimony of victim and of the defendant and it chose to accept the testimony of the victim.

3. Offense variables calculations are reviewed for an abuse of discretion. The trial court did not abuse its discretion in allowing a ten-point score for offense variable (OV) 4, which relates to serious psychological injury to the victim requiring professional treatment, even though the victim had undergone no professional treatment, but testified that she intended to do so in the future. MCL 777.34(2). Similarly, the trial court did not abuse its discretion in allowing a fifteen-point score for the offense variable (OV 10) relating to the defendant's predatory conduct, preoffense conduct directed at a victim for the primary purpose of victimization, given the evidence of the defendant's preoffense predatory conduct and the victim's vulnerability. MCL 777.40(1)(a), 777.40(3)(a).

4. Because the defendant's sentence for CSC III fell within the sentencing guidelines range, the argument that the sentence violated the cruel and unusual punishment clause of the US Const, Am VIII and the cruel or unusual punishment clause of Const 1963, art 1, § 16 is without merit. *People v McLaughlin*, 258 Mich App 636 (2003).

Affirmed.

1. CRIMINAL LAW — EVIDENCE — OTHER-ACTS EVIDENCE.

Other-acts evidence may be admitted if it is offered for a permissible purpose, i.e., to show something other than the defendant's propensity to commit the charged crime, it is relevant to an issue of fact of consequence at trial, and its probative value is not substantially outweighed by the danger of unfair prejudice; upon request, a trial court may provide an instruction to the jury regarding the limited use of the evidence (MRE 403, 404[b]).

2. RAPE — CRIMINAL SEXUAL CONDUCT — CORROBORATION OF TESTIMONY OF COMPLAINANTS.

There is no requirement that the testimony of a complainant of criminal sexual conduct be corroborated (MCL 750.520h).

3. CONSTITUTIONAL LAW — CRUEL OR UNUSUAL PUNISHMENT — SENTENCING
    GUIDELINES.

> A sentence that falls within the sentencing guidelines range does not
> violate the constitutional prohibitions against cruel or unusual
> punishment (US Const, Am VIII; Const 1963, art 1, § 16).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Thomas R. Grden*, Assistant Prosecuting Attorney, for the people.

*Michael J. McCarthy, P.C.* (by *Michael J. McCarthy*), for the defendant.

Before: CAVANAGH, P.J., and FITZGERALD and METER, JJ.

PER CURIAM. Defendant appeals as of right from his convictions by a jury of third-degree criminal sexual conduct (CSC III), MCL 750.520d(1)(b), and fourth-degree criminal sexual conduct (CSC IV), MCL 750.520e(1)(b). The trial court sentenced defendant to 127 months to thirty years of imprisonment for the CSC III conviction and to one to four years of imprisonment for the CSC IV conviction. We affirm.

I. FACTS

The victim testified at trial as follows: She met defendant in October 2001, when he joined her place of employment, Medicaid Assistance Services (Med-Assist) in Birmingham. They were friendly with one another at work. Around July 17, 2002, defendant called her to his office cubicle so that she could assist him with a computer problem. While at his cubicle, defendant grabbed her left wrist and "made [her] touch his crotch." With his other hand he rubbed one of her breasts. He told her that she had "made him hard" and that he wanted her to

"make him come." She did not tell anyone about the incident. Two days later, defendant came into her cubicle and again grabbed her wrist and made her "touch his crotch . . . ." He told the victim that she should have sexual intercourse with him. About 4:00 p.m., at the end of the workday, she was in a parking structure walking to her car when defendant approached her, grabbed her arm, and pulled her towards his car. He forced her into the passenger seat. She remained in the seat because she was afraid defendant would hurt her if she tried to leave. Defendant then "grabbed the back of the victim's head and forced" her to perform oral sex on him. Defendant told her that she should not "bother telling anybody." She did not tell her husband about the incident because she felt ashamed.

The victim stated that, after the incident in the parking structure, defendant "grabbed [her] wrist or . . . touch[ed her] breasts" about eleven or twelve other times. During one of the incidents, he again stated that the victim should have sexual intercourse with him. The victim stated that she finally told someone about the sexual assaults after defendant ceased working at Med-Assist in November 2002. She spoke to a coworker, RW, and to the president of the company, and then she spoke to the police.

On cross-examination, defense counsel insinuated that the victim waited to tell someone about the sexual contact between her and defendant because the contact had been consensual and she was married. He implied that, before the incidents of sexual contact, the victim had massaged defendant's shoulders and essentially invited the sexual incidents. He further implied that RW, with whom the victim spoke before going to the police, was a close friend of the victim's and had a grudge against defendant.

John Heppner, a detective with the Birmingham Police Department, testified as follows: He spoke with defendant on November 5, 2002, after the victim reported the incidents of sexual assault to the police. He and his colleague told defendant that a coworker had filed a complaint against him. They asked defendant if he knew who might have made such a complaint, and defendant suggested that it might have been RW, his neighbor, because "he had got into some trouble with RW's sister." When they asked about the possibility of him having improperly touched the victim, defendant "kind [of] chuckled and stated that if there was any [inappropriate] touching it was [a] mutual [thing]." Defendant stated that the victim had voluntarily rubbed herself against him and that "mutual groping" occurred several times throughout his employment at the victim's workplace. He stated that she voluntarily performed oral sex on him during the incident in the parking structure. Defendant stated that he believed the victim filed the complaint because she was "gang[ing] up" with RW to retaliate against him for the (as yet unspecified) incident involving defendant and RW's sister.

HW, RW's sister, testified as follows: She came to know defendant because he lived next to, worked with, and was friendly with her brother. On October 12, 2002, she met with her brother and defendant to see a horse race. They went to a bar after the race, and she agreed to give defendant a ride home in her vehicle. As she began driving, defendant reached across from the passenger seat and grabbed her inner thigh. He then attempted to grab her breast, and when she looked over at him, she saw that he had his penis exposed and was masturbating. He asked her to perform oral sex on him, and when she refused, he asked if he could perform oral sex on her. She refused. He also "grabbed [her] arm off the steering wheel" twice and tried to get her to touch

his penis. He zipped his pants up after HW told him she was not interested in having sex.

HW stated that she agreed to keep quiet about the incident but that she reported the incident to the police after speaking with her brother about it. When asked why she waited a day or two to report the incident, she stated that she had initially hoped it was an isolated incident and that she "was going to give him a chance to apologize to me, when he ran like a coward I told his wife."

RB testified that, in the spring of 2000, she came to defendant's house for a party. RB had some drinks, became tired, and decided to lie down in the children's room. When she awoke, defendant's "hands were on [her] buttocks and he was playing with himself." She immediately got up and left the premises. She told defendant's wife about the incident and also reported it to the police.

Forrest White, an employee at Med-Assist, testified that the victim's and defendant's cubicles were not adjacent and that to get from one to the other, "one would have to go out into the hallway and walk down another hallway . . . through doors."[1] He further testified that defendant did not share anyone else's cubicle and that defendant and the victim worked for different "teams" at Med-Assist.

Bruce Knight, the owner of Med-Assist, testified that all employees at Med-Assist receive a handbook detailing the company's policy concerning sexual harassment and that the handbook encourages employees to report prob-

---

[1] The victim testified that, at least for part of the time, she and defendant had adjacent cubicles. She also stated, however, that the cubicle adjacent to hers that defendant used was not defendant's "assigned cubicle" and that he was "sharing it with another employee who worked in the office part time."

lems at work. He testified that the victim had come to him in the past regarding various problems in the workplace.[2]

Carol Cottec, an employee at the parking structure used by Med-Assist employees, testified that, according to the electronic records, defendant left the parking structure at 1:05 p.m. on July 19, 2002.[3]

Defendant testified as follows: The victim approached him not long after he was hired at Med-Assist and began rubbing his shoulders and chest. About two weeks later, he and the victim came across one another in the parking structure and began "making out" in his car. She voluntarily performed oral sex on him. Afterwards, he and the victim would occasionally fondle one another while in the office. He never forced the victim to do anything against her will.

Defendant admitted that he "ma[d]e a pass at" HW and intimated that this occurred because he had drunk too much alcohol. With regard to RB's allegations, defendant stated that he never fondled her or masturbated in front of her but that he simply shook her to try to wake her up. Defendant further testified that, during the month of July 2002, he always left the office in the early afternoon.

On cross-examination, the prosecutor elicited that defendant had previously pleaded guilty of CSC IV in connection with the allegations made by RB.

---

[2] Knight's testimony implied that the victim could have easily reported the abuse perpetrated by defendant in a more timely fashion than she actually did.

[3] Defense counsel had elicited that the victim testified at the preliminary examination that the oral sex incident occurred on July 19, 2002; at trial she stated that she was not certain about the exact date. A review of the preliminary examination transcript reveals that she was not certain at that time, either, about the exact date.

The jury convicted defendant of CSC III and CSC IV with regard to the incidents occurring around July 17, 2002. The jury acquitted defendant of CSC IV with regard to an alleged incident of sexual contact occurring in October 2002.

## II. OTHER-ACTS EVIDENCE

Defendant first argues that the trial court erred in allowing the jury to hear evidence of the sexual incidents that occurred between HW and defendant and between RB and defendant. In admitting this evidence under MRE 404(b), the trial court stated, in part, that the evidence was "relevant to show the existence of a scheme, plan, or method by which the defendant accomplished the sexual assault in that consent is an issue, therefore, showing a scheme, plan, or method by which he non-consentually [sic] engages in sexual assault with women is relevant to this trial."

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Watson*, 245 Mich App 572, 575; 629 NW2d 411 (2001). "An abuse of discretion exists if an unprejudiced person would find no justification for the ruling made." *Id.* Under MRE 404(b)(1), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be used to prove something other than the defendant's propensity to commit a particular crime. *Id.*; *Watson, supra* at 576. Some permissible uses are "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material . . . ." MRE 404(b)(1). In *Watson,* this Court summarized the fac-

tors a court must consider when analyzing evidence under MRE 404(b):

> First, the prosecutor must offer the other acts evidence for a permissible purpose, i.e., to show something other than the defendant's propensity to commit the charged crime. [*People v VanderVliet,* 444 Mich 52, 74; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).] Second, the evidence must be relevant to an issue or fact of consequence at trial. *Id.* Third, the trial court must determine whether the evidence is inadmissible under MRE 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *VanderVliet, supra* at 74-75. Additionally, the trial court, on request, may instruct the jury on the limited use of the evidence. *Id.* at 75. [*Watson, supra* at 577.]

In *People v Sabin (After Remand),* 463 Mich 43, 48, 52; 614 NW2d 888 (2000), the defendant was convicted of first-degree criminal sexual conduct on the basis of his daughter's testimony that he engaged in sexual intercourse with her. The prosecutor introduced other-acts testimony from defendant's former stepdaughter in which she stated that defendant had sexually abused her for several years by performing oral sex on her and putting his penis between her legs. *Id.* at 49-51. The Supreme Court ruled that the other-acts evidence was properly admitted, stating:

> Today, we clarify that evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system. [*Id.* at 63.]

The Court noted:

> "[E]vidence that the defendant has committed un-charged criminal acts that are similar to the charged

offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. *Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense.*" [*Id.* at 66 (citation omitted).]

The Court then stated:

In this case, we conclude that the trial court did not abuse its discretion in determining that defendant's alleged assault of the complainant and alleged abuse of his stepdaughter shared sufficient common features to infer a plan, scheme, or system to do the acts. The charged and uncharged acts contained common features beyond mere commission of acts of sexual abuse. Defendant and the alleged victims had a father-daughter relationship. The victims were of similar age at the time of the abuse. Defendant allegedly played on his daughters' fear of breaking up the family to silence them. One could infer from these common features that defendant had a system that involved taking advantage of the parent-child relationship, particularly his control over his daughters, to perpetrate abuse. [*Id.*]

Applying the principles from *Sabin* to this case, we find no error requiring reversal with regard to HW's testimony. Indeed, the evidence concerning the incident with HW established that defendant grabbed her thigh and breast, exposed his penis to her, attempted to grab her hand and place it on his penis, and requested that she perform oral sex on him. The victim's testimony indicated that defendant, at various times, touched her breast, grabbed her wrist and placed her hand on his "crotch," exposed his penis, and forced the victim to perform oral sex on him. The assaults on both women involved the grabbing of the woman's body parts, the attempt to move the woman's

hand to defendant's penis, the exposure of defendant's penis, and the attempt (in the victim's case, the successful attempt) to receive oral sex. One could infer from these "common features" that defendant had a common scheme of suddenly grabbing unwilling women and seeking immediate sexual gratification from them. See, generally, *id.* The prosecutor therefore introduced the evidence for a proper purpose. Moreover, the evidence was "relevant under a permissible theory of logical relevance"—namely, to suggest to the jury that it was more likely that defendant committed the charged assaults because he used his common system in committing them. See *id.* at 63-64 n 10, 70. Additionally, "the danger of unfair prejudice did not substantially outweigh the probative value of the evidence," *id.* at 71, given the significant probative value of the evidence with regard to whether the charged sexual assaults (as opposed to mere consensual activity) occurred. Finally, the trial court gave a limiting instruction with regard to the other-acts evidence. Under the circumstances, no abuse of discretion occurred with respect to the jury's hearing evidence of the sexual incident between defendant and HW.

We similarly find no error requiring reversal with regard to the incident that occurred between defendant and RB. Indeed, the evidence of this incident showed once again that defendant employed a common scheme of suddenly grabbing unsuspecting women and seeking immediate sexual gratification. While it is true that RB could not testify with certainty that defendant exposed his penis during the incident (as he did with HW and the victim), RB nonetheless inferred from the defendant's movements that he was masturbating. The testimony about masturbation was, in our opinion, substantially equivalent to testimony that defendant exposed his penis. While the situation involving RB might be

one in which reasonable persons could disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by defendant in committing the acts . . . . [T]he trial court's decision on a close evidentiary question such as this one ordinarily cannot be an abuse of discretion. [*Id.* at 67.]

Considering all the circumstances, the prosecutor offered the evidence for a proper purpose; the evidence was "relevant under a permissible theory of logical relevance," see *id.* at 63-64 n 10, 70; and "the danger of unfair prejudice did not substantially outweigh the probative value of the evidence." See *id.* at 71. Moreover, the trial court gave an appropriate limiting instruction. Reversal is unwarranted.

III. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that the prosecutor presented insufficient evidence to support his convictions. In reviewing the sufficiency of the evidence, we "must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Hoffman,* 225 Mich App 103, 111; 570 NW2d 146 (1997); see also *People v Wolfe,* 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). All conflicts with regard to the evidence must be resolved in favor of the prosecution. *People v Terry,* 224 Mich App 447, 452; 569 NW2d 641 (1997). We must not interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses. *Id.*; *Wolfe, supra* at 514-515.

Defendant's argument borders on the specious and requires no extensive discussion. Indeed, defendant does not focus on any particular elements of CSC III or

CSC IV but merely argues that the victim's testimony was not believable. He emphasizes that no independent eyewitnesses or physical evidence existed to corroborate the victim's testimony. There is no requirement, however, that the complainant's testimony be corroborated in order for a CSC conviction to stand. MCL 750.520h. The victim's testimony established that defendant engaged in sexual penetration and in sexual contact with her contrary to MCL 750.520d(1)(b) and 750.520e(1)(b). It was up to the jury to assess her credibility. *Terry, supra* at 452; *Wolfe, supra* at 514-515. Reversal is not warranted.

## IV. SENTENCING GUIDELINES VARIABLES

Defendant next argues that the sentencing guidelines range (51 to 127 months) for his CSC III conviction was too high because two offense variable (OV) scores were miscalculated. Specifically, defendant objects to the scoring of OV 4 (psychological injury to a victim, see MCL 777.34) and OV 10 (exploitation of a vulnerable victim, see MCL 777.40). We review for an abuse of discretion issues concerning the proper scoring of sentencing guidelines variables. *People v Hornsby,* 251 Mich App 462, 468; 650 NW2d 700 (2002).[4]

---

[4] We note that defendant preserved his objections to the scoring as required by MCR 6.429(C). We further note defendant's allegation in a supplemental brief that *Blakely v Washington,* 542 US ___; 124 S Ct 2531; 159 L Ed 2d 403 (2004), applies to the sentencing in this case. We disagree with this contention. Indeed, the Michigan Supreme Court noted in *People v Claypool,* 470 Mich 715, 730 n 14; 684 NW2d 278 (2004), that *Blakely* does not affect Michigan's sentencing system. We disagree with defendant that this statement from *Claypool* is not binding on us. Nevertheless, given the large number of recent criminal appeals in which this issue has been raised, we request that the Supreme Court issue *its* opinion concerning whether footnote fourteen in *Claypool* constitutes binding precedent.

Defendant received ten points for OV 4. A defendant is to receive ten points for OV 4 if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). As noted by the trial court, ten points are to be assessed "if the serious psychological injury may require professional treatment. In making this determination, *the fact that treatment has not been sought is not conclusive.*" MCL 777.34(2) (emphasis added). We conclude that the evidence supported the ten-point score for OV 4. Indeed, the "Victim Impact Statement" in the presentence investigation report states, in part, that the victim's

> life has been terrible since the incidents. She states that she has a lot of nightmares, problems in her marriage, problems at work, and in just about every other facet of her life. She states that this whole situation has been a nightmare, and again has [a]ffected every area of her life. She indicates that she has not sought treatment as of this writing date, however, she plans to do so in the future.

The evidence of the victim's disrupted life, her nightmares, and her plans to seek treatment supported the ten-point score. No error occurred with respect to the scoring of OV 4.

Defendant received fifteen points for OV 10. A defendant is to receive fifteen points for OV 10 if "[p]redatory conduct was involved." MCL 777.40(1)(a). "Predatory conduct" is defined as "preoffense conduct directed at a victim for the primary purpose of victimization." MCL 777.40(3)(a). The trial court stated, in part, as follows with regard to the scoring of OV 10:

> Vulnerability, clearly this victim, anyone who observed her demeanor on the stand would assess or attest to her vulnerability. She was what I would classify as readily susceptibility [sic] of a victim. To persuasion, to psychological injury based on her past.

Accordingly, if I believe the defendant's story, she consistently went to the defendant with complaints about her marriage, the fact that she couldn't handle it. All these factors are not conclusive but in this court's mind and based on all the testimony hear[d] in this trial, considering the 404-B conduct, considering the conduct the defendant exhibited toward the victim in this case, this is an extremely appropriate scoring. Predatory conduct is exactly how I would describe the defendant in this case.

We find no abuse of discretion with respect to the scoring of OV 10. The victim testified that defendant fondled her and grabbed her wrist around July 17, 2002, before the instance of penetration supporting the CSC III conviction. Defendant told the victim that she had "made him hard" and that he wanted her to "make him come." Two days later, he stated that she should have sexual intercourse with him. He then approached the victim in a parking structure, grabbed her arm, and forced her to enter his car before the act of penetration occurred. Additionally, even though this fact did not come out at trial because of the prosecutor's successful motion in limine, the trial court was aware that the victim had attempted suicide in the past. The trial court's findings indicate that it considered the victim's demeanor and came to a reasoned conclusion that she had been a vulnerable victim. Under all the circumstances, the trial court did not err in allowing a fifteen-point score for OV 10.

## V. CRUEL OR UNUSUAL PUNISHMENT

Next, defendant argues that his sentence for the CSC III conviction violates the constitutional prohibitions against cruel or unusual punishment. See US Const, Am VIII (prohibition against cruel and unusual punishment); Const 1963, art 1, § 16 (prohibition against cruel or unusual punishment). Because defendant's sentence

fell within the sentencing guidelines range, this argument is without merit. See *People v McLaughlin,* 258 Mich App 635, 669-671; 672 NW2d 860 (2003). At any rate, the sentence was proportionate in light of the circumstances surrounding the offense and the offender, and a proportionate sentence does not constitute cruel or unusual punishment. See *People v Colon,* 250 Mich App 59, 66; 644 NW2d 790 (2002).

Affirmed.