*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 07, 2025
9:06 AM

Plaintiff-Appellee,

v

No. 361971
Wayne Circuit Court
LC No. 19-002879-01-FC

JACK LAMONT BEACH,

Defendant-Appellant.

Before: MALDONADO, P.J., and PATEL and N. P. HOOD, JJ.

PER CURIAM.

Defendant, Jack Lamont Beach, appeals by right his jury trial convictions of first-degree premeditated murder, MCL 750.316(a), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] The trial court sentenced Beach to life imprisonment without the possibility of parole for the murder conviction and two years' imprisonment for the felony-firearm conviction. On appeal, Beach asserts claims of error consisting of a speedy trial violation, 180-day rule violation, and several trial-related issues. Finding no reversible error, we affirm.

## I. BACKGROUND

This case arises out of Beach's participation in the shooting death of Lloyd Butts. Butts was shot three times while standing in front of a residence on Chapel Street in Detroit. He walked a very short distance to the porch of another home on Chapel Street before he collapsed and died. The murder was on December 10, 2018. Beach was arrested for absconding from parole on December 24, 2018. And on February 5, 2019, members of the Detroit Police Department arrested

---

[1] The judgment of sentence mistakenly indicates that Beach was convicted of first-degree felony murder, MCL 750.316(b). Although Beach was originally charged with first-degree felony murder, the prosecution amended the information during the proceedings and instead charged him with first-degree premeditated murder. The jury convicted Beach of first-degree premeditated murder.

Beach for Butt's murder, transporting him from the Detroit Reentry Center, a Michigan Department of Corrections (MDOC) facility, to the Wayne County Jail. Beach remained in custody until his trial began on March 7, 2022, over three years later.

There were numerous pretrial delays, some attributable to the prosecution, some attributable to Beach, and some attributable to the COVID-19 pandemic and resultant court closures. Notably, in May 2019, the trial court set an original trial date for October 9, 2019. At a final conference on September 11, 2019, the parties discussed the discovery of an inculpatory letter that Beach wrote from jail, and the trial court adjourned the October 2019 trial date. Beach also filed successive motions to quash the information. And the prosecution indicated its intention to amend the information to change the lead charge from felony murder (associated with drug trafficking) to premeditated murder.[2] Regarding Beach's first motion to quash, and in light of the prosecution's intent to amend the information, the trial court ruled that the evidence was insufficient to support bindover for felony murder and remanded the case to the district court. The district court held the preliminary examination on remand on March 13, 2020, and bound Beach over to trial court on premeditated murder and felony-firearm.

On March 18, 2020, our Supreme Court issued administrative orders halting all jury trials due to the COVID-19 pandemic. Between March 2020 and Beach's trial date, the trial court held numerous pretrial conferences. During that time, Beach filed numerous motions to dismiss for purported speedy-trial violations and 180-day rule violations. Between October and November 2020, Wayne Circuit Court held only two jury trials until COVID-19 numbers rose again, and it stopped holding jury trials in accordance with the administrative orders. Wayne Circuit Court gradually increased the volume of jury trials after the pause. At a pretrial conference on March 23, 2021, the trial court informed the parties that Wayne Circuit Court was conducting one to two jury trials per week. As stated, Beach's trial began on March 7, 2022.

During the trial, there was no dispute that Beach was at the scene of the shooting, having arrived there in a red GMC Envoy driven by his one-time codefendant, Susan Walker. Also present in the vehicle were Anthony McGee, known as "Lil Ant" or "Ant," and a male individual known only as "Flave." The prosecution's theory of the case was that Beach planned and participated in the killing because he believed Butts had acted in the past as an informant for federal authorities. According to the prosecution, Beach knew Butts, and the murder was a gang-related assassination. The prosecution acknowledged in closing argument that there was a lack of evidence showing that Beach was the shooter; therefore, its case hinged on an aiding-and-abetting theory. The defense's theory was that, although Beach was present at the crime scene, Ant—and possibly Flave—committed the shooting, and that Beach had no idea whatsoever that there existed any intent to shoot Butts. Beach claimed that he did not even know Butts and that all he knew beforehand and while en route to the scene was that Ant and Butts were going to engage in a drug transaction involving Adderall pills. Defense counsel asserted that Beach was merely present at the scene, providing no aid or assistance regarding the shooting.

---

[2] The prosecution initially sought to charge Beach with felony murder associated with a drug transaction involving Adderall pills but later conceded that Adderall was not one of the drugs covered by the statutes upon which it relied.

There was no eyewitness testimony at trial. The prosecution offered testimony of a woman who saw flashes and heard gunfire before seeing Butts collapse and die on her porch. The prosecution also introduced surveillance video footage that showed flashes of light (presumably gunfire) before a car drove away. But there was little direct evidence of Beach's involvement with the shooting.

Instead, the prosecution relied predominantly on circumstantial and forensic evidence to establish Beach's guilt. Through the testimony of numerous Detroit police officers, detectives, and forensic technicians, the prosecution established without dispute that the following pieces of evidence were discovered at the scene of the crime: a black Inter-Arms .38 Special Revolver loaded with five live rounds, which was its full capacity; two 7.62 x 39 mm shell casings; one .25 automatic shell casing; one 7.62 x 39 mm live round; a dirty hand impression on a fence; and a baggie of orange pills. Investigators swabbed much of the physical evidence for DNA testing. A forensic scientist with the Michigan State Police, Jennifer Dillion, testified as an expert in forensic biology that no DNA profiles could be developed from the shell casings, the live round, the hand impression, and the baggie containing the orange pills.[3] A DNA profile was developed from the trigger and grip of the .38 caliber revolver found at the scene, and Dillion opined that the testing revealed that four persons contributed to the profile, with there being very strong support that Ant was not a contributor and that Butts was a contributor.

Brian Grabowski, a firearm and toolmarks examiner with the Michigan State Police, testified as an expert in that field that the two 7.62 x 39 mm shell casings found at the crime scene came from the same firearm. The prosecution did not present any evidence that the two firearms[4] discharged in the shooting were ever located, nor did the prosecution produce any eyewitnesses to the shooting.

A significant component of the prosecution's case was cell phone communications, whether by calls or text messages, showing numerous exchanges between certain phone numbers. Butts had a Samsung cell phone, with a 586-area-code phone number ending in 9926. Beach had an LG cell phone, with a 616-area-code phone number ending in 8231. And Ant had a cell phone, of unknown brand, with a 313-area-code phone number ending in 8257. As established by the testimony of police officers, detectives, a sergeant, and a lieutenant, some of whom were involved and experienced in extracting data and information from cell phones using Cellebrite (cell phone extraction technology and software), there were a series of calls and text messages between Beach's 616 cell phone and Butts's 586 cell phone on December 10, 2018, leading up to and just before the murder.[5] There were no phone contacts between Beach's 616 cell phone and Ant's 313

---

[3] The orange pills were destroyed and never analyzed to determine their chemical composition.

[4] Both the prosecution and Beach operated on the basis that two firearms were discharged in the shooting given the two calibers of shell casings found at the scene, which demonstrated that either one person wielded two different weapons or that there were two shooters.

[5] As will later be discussed, Beach claimed in his interrogation that Ant was using his cell phone when communicating with Butts before the shooting. Through cell phone tower data and information, Beach's 616 cell phone was placed in the area of the murder.

cell phone before the murder, but there were text messages between the two phones after the murder.

Sergeant Robert Wellman, who worked in the Major Crimes Unit for the Detroit Police Department, mapped out and plotted the vicinity or area where the cell phone calls and text messages were being made based on pings from cell phone towers, a method that yields an approximation of location through triangulation. Lieutenant Derrick Griffin, who was employed by the Detroit Police Department and assigned to the Homicide Division, testified that the most frequently used password by Beach on his cell phone was "Vice Lord 2212." According to Lieutenant Griffin, there were 17 to 18 phone calls or text messages from Butts's 586 cell phone to Beach's 616 cell phone *after* Butts was murdered, and this was explained through the testimony of Butts's girlfriend, Kierra Mitchell.

Mitchell, who was 15 years old and Butts's girlfriend at the time he was murdered, testified about the events immediately preceding his murder. At the time, Mitchell and Butts were living at 19948 Chapel St. with three others who were present when the shooting occurred. According to Mitchell, Butts spent his time selling fake Adderall pills and iPhones on an application called MocoSpace through anonymous user names. Mitchell testified that Butts showed her text messages about a deal for pills on the day of the murder. The trial court allowed Mitchell to provide testimony under MRE 803(3) (then-existing state of mind as to intent) that Butts told her that he discovered that he knew the person who sought to make a purchase of Adderall pills; therefore, he was going to tell the person that the pills were fake and then just chat or visit with him. Butts had Mitchell talk with the person on his cell phone, telling her to say that Butts was her brother. Butts showed her a picture of the person on Butts's cell phone, presumably a photograph of Beach, and she did not recognize the individual, nor had she ever previously communicated with him. There were numerous text messages and calls between Butts and the prospective buyer, who, according to Mitchell, never identified himself to her. Mitchell testified that Butts eventually left the house after using his cell phone, that he told her that he was going to meet the buyer, and that she stayed in the house.

Mitchell indicated that about five minutes after Butts left the house, she heard gunshots. She never saw Butts again, nor did she ever observe the person or persons who awaited and shot Butts. Mitchell stated that Butts had a .38 caliber revolver that he regularly carried. She also claimed that Butts took the revolver with him and placed it in his pants when he left the house to meet the purchaser. Mitchell testified that she initially made false statements to the police because she was scared and her and Butts's roommates wanted her to lie, but she later provided officers with an honest account of events. Butts had not taken his cell phone with him when he left the house, and Mitchell did not give the phone to the police, at least at first. Mitchell made all the phone calls and sent all the text messages from Butts's 586 cell phone to Beach's 616 cell phone after the murder, voicing threats to the person whom she assumed had shot and killed her boyfriend.

Critical to this appeal, the prosecution also introduced an inculpatory letter that Beach wrote from jail while awaiting trial and opinion testimony that the letter contained gang symbolism

and phraseology, specifically that used by the Vice Lords.[6]  Lieutenant Griffin read Beach's jailhouse letter to the jury, which stated, in part:

> First and foremost I apologize for not getting back at you asap.  Well it starts when I was in Boyne City when you sent your people at me.  He sent a snow bunny at the hotel with about a zip of doggy.  So I took half and me and my snow bunny came down state.  Did a nice flip.  So the snow . . . bunny your people sent stay at the hotel in Boyne city.  Well I was [absconded] at the time.  So a rat called me -- called on me so I got arrested.  Gave my snow bunny the cash, and told her to contact the plug.  Well they sent me to Ryan.  I ended up doing 45 days.  Well to make a long story short I found out who talked to the Feds.  So I did my investigation.  I talked to the nation in the Chi and enlightened the bros on the situation.  So I came up with the plan once it came from up top.  It was one of our own so that needed to be done right I thought.  Everything was sweet until the Feds put a be on the lookout on the shooter's vehicle.  So I tell the female who was a part of this situation to go flip the whip.  Well she took her time and they found her in the SUV.  The Feds used the other females I was with tactit on her.  So the bitch put us at the scene. That's all I can say. Count 1, felony murder. 2, felony firearm . . . .

The letter at issue was in an envelope addressed to Sterling May, a prisoner housed at the Michigan Reformatory, a prison within the MDOC.  Personnel at the Michigan Reformatory seized the mail for inspection.  The return address on the envelope listed "Mr. JACK BEACH" as the sender.  And along with the letter, the envelope also contained autopsy photos, apparently of Butts.

Before, during, and after the trial, the letter and related testimony were the subject of various motions.  The discovery of the letter and its disclosure contributed to some of the early delays in the case.  Most notably, the letter contributed the prosecution's decision to refile the case to charge premeditated murder instead of felony murder.  In 2020, the defense filed an unsuccessful motion in limine to exclude it.  It was also the subject of a motion for a mistrial after the prosecutor's opening statement that the evidence would show that Beach was a member of the Vice Lords.

During the trial, the letter became the subject of discussion several times in relation to whether Officer Todd Bechler, an MDOC employee, could testify as to his opinion that the language and numerals in the letter exhibited phraseology and symbolism used by the Vice Lords.  Defense counsel argued that Officer Bechler could not testify as an expert witness, and the prosecution responded that it did not intend to offer him as an expert.  The prosecutor explained that Officer Bechler would be testifying as a lay witness "based on his own personal experiences"

---

[6] The Vice Lords, or Almighty Vice Lord Nation, is a street and prison gang based in Chicago, Illinois that operates largely in the Great Lakes region.  As of 2009, it had an estimated membership of between 30,000 and 35,000.  See National Gang Intelligence Center, *National Gang Threat Assessment 2009* <https://web.archive.org/web/20110228194543/http://www.justice.gov/ndic/pubs32/32146/appb.htm (accessed January 23, 2025).

with gangs inside the prison system. The trial court reviewed MRE 701 regarding opinions by lay witnesses and expressed the thought that, although Officer Bechler may be able to testify based on his personal experiences that the letter contained terminology or symbolism used by gangs, it questioned how he could make a specific connection to the Vice Lords. The court made a preliminary determination that Officer Bechler would not be permitted to testify that references in the letter were specific to the Vice Lords; however, the court indicated that he might be allowed to so testify if he could state that the language and numerals were indeed specific to the Vice Lords.

After voir dire outside of the presence of the jury, where defense counsel established that Bechler had no personal knowledge of Beach's gang affiliation, the trial court ruled that Bechler could testify as a lay opinion witness. It noted that he likely could have (or should have) been qualified as an expert, but the prosecution did not do that. Over the defense's objection, he testified.

Officer Bechler testified about his background and knowledge relative to gangs, including the Vice Lords. He then testified about aspects of the letter that suggested a connection to the Vice Lords. This included designation to the number "55," which he identified as a greeting among Vice Lords and references to "the nation in the 'Chi,' " as the Vice Lords' leadership in Chicago. During his testimony, he noted that on page two of the letter, Beach wrote, "You know we are Almighty." Officer Bechler opined that the verbiage "could be referencing the Almighty Vice Lord Nation." On cross-examination, defense counsel was able to elicit from Officer Bechler that the references to the "Almighty" and "Chi" in the letter could simply have had a religious connotation and been connected to the Muslim religion and faith in Chicago. Officer Bechler agreed that the references in the letter that he viewed as being related to the Vice Lords could possibly have different meanings

The prosecution also provided a largely self-exculpatory written statement that Beach provide to the police. The prosecution further played a recording of Beach's interrogation for the jury.

The jury found Beach guilty as charged. Beach unsuccessfully moved for a new trial. This appeal followed.

## II. SPEEDY TRIAL

Although there were substantial delays between Beach's arrest and trial. We conclude that his constitutional right to a speedy trial was not violated.[7]

---

[7] "Whether defendant was denied his right to a speedy trial is an issue of constitutional law, which we . . . review de novo." *Williams*, 475 Mich at 250. But underlying factual findings are reviewed for clear error. *Id.*; see also *Waclawski*, 286 Mich App at 664 ("The determination whether a defendant was denied a speedy trial is a mixed question of fact and law."). De novo review "means that we review the issues independently, with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019). On the other hand, clear error only exists when

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a speedy trial." *People v Waclawski*, 286 Mich App 634, 665; 780 NW2d 321 (2009), citing US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A). In *People v Williams*, 475 Mich 245, 261-262; 716 NW2d 208 (2006), our Supreme Court explained:

> The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest. In contrast to the 180–day rule, a defendant's right to a speedy trial is not violated after a fixed number of days . . . . In determining whether a defendant has been denied the right to a speedy trial, we balance the following four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury. Under the . . . test, a presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial. [Quotation marks and citations omitted.]

Regarding the first factor—the length of the delay—the delay between Beach's arrest on February 5, 2019, and the start of trial on March 7, 2022, was over three years; therefore, there is a presumption of prejudice. *Williams*, 475 Mich at 262. The burden shifts to the prosecution to show the absence of an injury, and an inquiry into the other factors is triggered.[8] We reject the prosecution's stance that the only delay to measure in this case relative to the prejudice question is that which ran from the point in time when jury trials were resumed after the pandemic until the date of trial.

In *People v Williams*, we made no distinction between delays attributable to the defendant or the prosecution when calculating the overall length of the delay under factor one. There, we stated that "[b]ecause the length of delay between [the] defendant's arrest and the trial was over nineteen months, the delay was presumptively prejudicial. Thus, we must consider the other . . . factors to determine if [the] defendant has been deprived of the right to a speedy trial." *Williams*, 475 Mich at 262. In evaluating the reasons for the delay, the *Williams* Court upheld the trial court's

---

we are "left with a definite and firm conviction that a mistake was made." *People v Abbott*, 330 Mich App 648, 654; 950 NW2d 478 (2019). "In addition, this Court must determine whether any error was harmless beyond a reasonable doubt[,]" and a "[v]iolation of the constitutional right to a speedy trial requires dismissal of the charge with prejudice." *Waclawski*, 286 Mich App at 664. We review de novo legal issues concerning the statutory 180-day rule. *People v McLaughlin*, 258 Mich App 635, 643; 672 NW2d 860 (2003).

[8] The prosecution relies heavily on the second factor, i.e., the reason for the delay, to evaluate and measure the first factor, i.e., the length of the delay, for purposes of assessing the application of the presumption in the context of the "prejudice" factor. The inquiry into the reason-for-delay factor is only triggered when there is a presumptively-prejudicial delay of 18 months or more. The prosecution thus misapplies the four-factor balancing test. The fact that a substantial portion of the pretrial delays related to COVID-19 does not change the length of the delay.

finding that a nearly three-month delay was attributable to the defendant, yet the Court did not subtract that three-month period from the length of the delay; prejudice was still presumed. *Williams*, 475 Mich at 262, 264-265. In short, the length of the delay in this case was substantial: over three years.

Regarding the second factor—reasons for the delay—the analysis is more complicated. There were many delays in this case over the course of three-plus years, and there were a variety of reasons for the delays, including most of those discussed in the following authorities. The panel in *Waclawski*, 286 Mich App at 666, observed:

> In assessing the reasons for delay, this Court must examine whether each period of delay is attributable to the defendant or the prosecution. Unexplained delays are charged against the prosecution. Scheduling delays and docket congestion are also charged against the prosecution. However, [a]lthough delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial. [Quotation marks and citations omitted.]

In *Barker v Wingo*, 407 US 514, 531; 92 S Ct 2182; 33 L Ed 2d 101 (1972), the United States Supreme Court addressed additional reasons for delays:

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

A delay due to the complexity of the case and related evidence is deemed a legitimate delay. *People v Cain*, 238 Mich App 95, 113; 605 NW2d 28 (1999). Generally, a delay caused by an adjournment sought by a defendant or created by a substitution of defense counsel is attributed to the defendant. *Id.* And delays caused by adjudicating motions filed by a defendant are also charged to the defendant. *Id.* Delays sought by defense counsel, whether counsel is retained or assigned, are ordinarily attributable to the defendant. *Vermont v Brillon*, 556 US 81, 90-91; 129 S Ct 1283; 173 L Ed 2d 231 (2009). The time between a dismissal without prejudice and reinstatement of a charge is not attributed to either party because there is no pending charge during the interim. *People v Wickham*, 200 Mich App 106, 111; 503 NW2d 701 (1993).

With respect to the COVID-19 pandemic and the impact of the related delays in conducting jury trials, this Court recently held:

> We follow the overwhelming weight of authorities and hold that delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim. Unlike delays inherent in the court system which

are attributable to the prosecution, delays resulting from emergency public-health measures during an unprecedented global pandemic are anything but. And these pandemic-related delays in criminal proceedings across Michigan were neither unexplained nor inexcusable. To hold a trial amid the pandemic would have required that jurors, witnesses, counsel, and courthouse personnel act contrary to the advice of public health professionals and put themselves in harm's way. As the trial court explained in great detail, and the record confidently supports, the extenuating circumstances brought about by the pandemic prevented the government from trying [Smith] in a speedy fashion. [*People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 5-6 (quotation marks and citations omitted).]

The recent decision in *Smith* relied on this Court's prior holding in *People v Witkoski*, 341 Mich App 54, 63; 988 NW2d 790 (2022), where, this Court reached the same conclusion in the context of the 180-day rule, holding:

> Significantly, much of the delay in defendant's scheduled jury trial resulted from our Supreme Court's decision to suspend jury trials in response to the COVID-19 pandemic. This delay is somewhat analogous to the one encountered in *People v Schinzel (On Remand)*, 97 Mich App 508, 512; 296 NW2d 85 (1980), where the delay was caused by a wholesale change in docketing systems approved by our Supreme Court. The *Schinzel* Court concluded that the delay was excusable under the 180-day rule. *Id.* at 511. Although we are not bound by the decision in *Schinzel* because it was issued prior to November 1, 1990, MCR 7.215(J)(1), we find its analysis on this question persuasive.[9]

With these principles in mind, we analyze the prepandemic and pandemic/postpandemic delays below.

Focusing first on the prepandemic delays, i.e., the 13-month period between Beach's arrest on February 5, 2019, and the court closure on March 18, 2020, we attribute the balance of the fault for those delays to the prosecution while acknowledging some contributing fault from Beach.[10] A substantial portion of the prepandemic delays stem from the lack of evidence supporting Beach's original charge: felony murder related to an alleged robbery. Given the absence of evidence that a robbery occurred, as the district court found at the original preliminary examination, the lack of an underlying drug offense or transaction, and the prosecution's delay in pursuing a premeditated murder charge, the fault for the initial delays lies at the feet of the prosecution. This led to Beach's original motions to quash and ultimately the remand to the district court just before the COVID-

---

[9] To clarify, although published opinions issued before November 1, 1990 are not strictly binding pursuant to MCR 7.215(J)(1), they nevertheless have precedential effect under the rule of stare decisis pursuant to MCR 7.215(C)(2). *People v Darga*, ___ Mich App ___, ___ n 6; ___ NW3d ___ (2023) (Docket No. 363178); slip op at 6.

[10] We note that the trial court reached a similar conclusion when addressing one of Beach's numerous speedy-trial motions.

19 shutdown. Arguably, Beach should not have been charged (or arrested) in February 2019. Had that not been the case, his jailhouse letter, which contributed to further delays, would not have come into existence. Admittedly, Beach also contributed to delays by challenging the authenticity of the letter, which at trial he backed away from doing, and by requesting a criminal-responsibility evaluation. With the letter becoming the centerpiece of the case and its discovery sometime between July and September 2019, what is clear is that a trial could never have been completed before the pandemic started.

Thereafter, pandemic-related delays, consistently with *Smith*, ___ Mich App at ___, slip op at 2-8, and *Witkoski*, 341 Mich App at 63, should not be weighed or held against the prosecution. Postpandemic delays, except perhaps for the last three months before trial, are attributable to Beach or at least not against the prosecution; there was plenty of blame on the part of both parties, as reflected by the trial court's continuing frustration with the prosecutor and defense counsel.

In sum, the second factor cuts both ways. We conclude that the prosecution was predominantly responsible for the 13-month prepandemic delay. On the other hand, Beach contributed to many of the delays in the last three months before his trial began. The remainder of the pandemic and postpandemic delays were due to COVID-19's impact on the courts, and neither side is at fault. As discussed later, to the extent that the prosecution is at fault for a portion of the delay, the stark lack of prejudice preponderates against finding a speedy-trial violation.

Regarding the third factor—assertion of the right to a speedy trial—Beach filed numerous pro se motions invoking his right to a speedy trial, initially moving for relief on September 16, 2020, which was approximately 19 months after his arrest. We therefore conclude that the third factor favors Beach.

Regarding the fourth factor—prejudice to the defendant—there was a conclusive lack of prejudice to the defense or to Beach's person. To the extent that the delays over the three-year period were attributable to or weighed against the prosecution and lend support to find a violation of Beach's constitutional right to a speedy trial, we conclude that the prosecution overcame the presumption of prejudice to such an overwhelming degree that there is no basis to reverse or vacate Beach's convictions. Even with the presumption of prejudice, the nearly complete absence of prejudice to Beach and his defense ultimately derails his speedy-trial argument.

In the context of a speedy-trial claim, there are two types of prejudice: prejudice to the defense and prejudice to the person. *Waclawski*, 286 Mich App at 668. "Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citations omitted). "Our Supreme Court has repeatedly recognized in the context of lengthy pretrial incarcerations that the most significant concern is whether the defendant's ability to defend himself or herself has been prejudiced." *Waclawski*, 286 Mich App at 668-669 (quotation marks and citation omitted). A generalized allegation of prejudice caused by delay, such as the unspecified loss of evidence or fading of memories, is insufficient to establish that a defendant was denied his right to a speedy trial. *People v Gilmore*, 222 Mich App 442, 462; 564 NW2d 158 (1997). Increased anxiety alone does not suffice. *Id.* "[I]n determining prejudice to a defendant, we do not look at how the prosecutor's case was improved during the delay, but to whether the

-10-

defendant's defense was degraded." *People v Holtzer*, 255 Mich App 478, 494; 660 NW2d 405 (2003). The full extent of Beach's argument regarding prejudice is as follows:

> Prejudice is presumed due to the length of the delay. Additionally, prejudice is clear from the record: the original [officer in charge] indicated that he could not answer some of the questions because of the amount of time that had gone by. Other witnesses had to have their recollection refreshed.

First, Beach cannot establish prejudice to his person because he was already under arrest and in jail for absconding from parole when the Detroit police picked him up at the Detroit Reentry Center. Due to his extensive criminal record, had he not been in jail awaiting trial in the instant case, it would appear that he was facing a possible return to prison for a parole violation.

Regarding the more serious matter of prejudice to the defense, the record demonstrates that the three-year wait to be tried did not create an inability by Beach to prepare his defense and defend himself at trial. There was no degradation of Beach's theory of the case. Beach provides no specific examples of how he was prejudiced. It is true that witnesses had to refresh their memories by looking at reports and other documentation from time to time, but there is no indication that a failed recollection harmed or prejudiced the defense. Beach argued to the jury that he was merely present at the crime scene, that he did not provide any aid or assistance in the shooting, that he had no idea that Ant or Flave intended to shoot Butts, that Beach did not even know Butts, and that he was taken completely by surprise when his acquaintances opened fire on Butts. The support for this defense came from Beach's own interrogation statement to the police; he never wavered in conveying his version of events. In trying to prove that Beach committed first-degree premeditated murder, the prosecution relied heavily on evidence comprised of the jailhouse letter, the cell phone communications, and Mitchell's testimony. The letter did not even come into existence until Beach was in jail, and the delays had no effect on that piece of evidence. The passage of time did not change, impact, diminish, or increase the value of the cell phone data and information. Regarding Mitchell's testimony, she did not sway or show a lack of memory relative to the testimony most damaging to Beach. Furthermore, Beach presents a generalized allegation of prejudice caused by delay, such as the unspecified fading of memories, which is insufficient to establish that he was denied his right to a speedy trial. *Gilmore*, 222 Mich App at 462. He does not point to anything that he would have done differently in defending himself had the trial taken place earlier. The prosecution has met its burden of overcoming the presumption of prejudice. We therefore conclude that despite the significant delays in this case, Beach's right to a speedy trial was not violated.

### III. 180-DAY RULE

Beach also argues that the prosecution and trial court violated the 180-day rule, MCL 780.131. We disagree. Detroit police transferred Beach from MDOC custody to the Wayne

County Jail on the day he was arrested, February 5, 2019, where he remained for the next three-plus years absent any parole-violation proceedings, so we conclude there was no violation.[11]

The 180-day rule is found in MCL 780.131, and in particular, subsection (1) of the statute provides:

> Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint. The request shall be accompanied by a statement setting forth the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time or disciplinary credits earned, the time of parole eligibility of the prisoner, and any decisions of the parole board relating to the prisoner. The written notice and statement shall be delivered by certified mail.

"In the event that, within the time limitation set forth in section 1 of this act, action is not commenced on the matter for which request for disposition was made, no court of this state shall any longer have jurisdiction thereof, nor shall the untried warrant, indictment, information or complaint be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." MCL 780.133.

The 180-day rule is not a requirement that the trial take place within 180 days. *Witkoski*, 341 Mich App at 60. The statute does not mandate that an action be commenced so early within the 180-day period as to insure trial or completion of a trial within the statutory period. *Id.* Instead, when apparent good-faith action is taken by the prosecutor well within the period and the prosecution proceeds promptly thereafter toward readying the case for trial, the statutory condition for the court's retention of jurisdiction is satisfied. *Id.* The object of the 180-day rule is to dispose of new criminal charges that are brought against inmates of a Michigan correctional facility. *Id.* at 60-61. The rule requires dismissal of the charges if the prosecutor does not commence an action on charges pending against the inmate within 180 days after the MDOC delivers notice of the inmate's imprisonment. *Id.* at 61. While a prosecutor must proceed promptly and take actions in good faith to satisfy the 180-day rule, there is no good-faith exception to the rule. *Id.* Rather, good faith is an implicit aspect of proper action by the prosecutor, and there is no compliance with the rule simply by taking preliminary steps toward trial if the prosecutor then engages in an inexcusable delay. *Id.*

---

[11] This Court reviews for clear error the trial court's attributions of delay relative to the 180-day rule. *Witkoski*, 341 Mich App at 59.

-12-

Further, the statutory 180-day period is a fixed period of consecutive days commencing on the date when the prosecutor receives the mandatory notice from the MDOC. *Id.*[12] The relevant question, therefore, is not whether 180 days of delay since that notice date may be attributable to the prosecutor, but whether action was initiated within 180 calendar days after the date the notice was received by the prosecutor. *Id.* If so, the statutory rule has been satisfied unless the prosecution's initial steps are followed by an inexcusable delay beyond the 180-day period accompanied by an intent not to bring the case to trial in a prompt manner. *Id.* at 61-62. Thus, a court should not calculate the 180-day period by apportioning to the parties periods of delay following the delivery of the notice by the MDOC. *Id.* at 62. As noted earlier, when analyzing the speedy-trial issue, delays caused by the pandemic do not amount to inexcusable delays. *Id.* at 63. "When the people have moved the case to the point of readiness for trial and stand ready for trial within the 180-day period, defendant's delaying motions, carrying the matter beyond that period before the trial can occur, may not be said to have brought the statute into operation, barring trial thereafter." *People v Davis*, 283 Mich App 737, 741-742; 769 NW2d 278 (2009).

Here, Beach was in an MDOC facility—the Detroit Reentry Center[13]—at the time of his arrest by the Detroit police on February 5, 2019, but he was solely housed in the Wayne County Jail from that date forward. In other words, he awaited trial in the custody of the county jail and not the MDOC. The purpose of the statutory 180-day rule is to dispose of untried charges against MDOC inmates so that sentences may run concurrently. *People v McLaughlin*, 258 Mich App 635, 643; 672 NW2d 860 (2003). Importantly, "the statute applies only to those defendants who, at the time of trial, are currently serving in one of our state penal institutions, and not to individuals awaiting trial in a county jail." *Id.*, citing in part *People v Chambers*, 439 Mich 111, 116; 479 NW2d 346 (1992). Accordingly, a defendant is not entitled to relief under MCL 780.131 if they were detained in the county jail before trial. *McLaughlin*, 258 Mich App at 643-644.

Beach was being held at the Detroit Reentry Center for absconding from parole. And "this Court has consistently held that, until revocation of parole, a paroled prisoner who is being detained locally, and against whom a parole hold has been filed, is not, because of the hold, awaiting incarceration in a state prison nor an inmate of a penal institution to whom the 180-day rule applies." *People v Gambrell*, 157 Mich App 253, 257; 403 NW2d 535 (1987). In the presentence investigation report (PSIR) in this case, the investigating agent wrote:

> A Parole Violation Worksheet and Decision Report indicated the parole decision was to process a parole extension and have the defendant remain on WRIT to the Wayne County Jail until the instant case is resolved. *Therefore, his parole violation is still pending*. [Emphasis added.]

---

[12] The notice must be delivered to the prosecutor; delivery to an investigating police officer is not sufficient. *Williams*, 475 Mich at 256.

[13] A prisoner is incarcerated in a state correctional facility if he is assigned to a community corrections center under the control of the MDOC. *People v McCullum*, 201 Mich App 463, 465; 507 NW2d 3 (1993).

Yet another reason to rule in favor of the prosecution on Beach's 180-day-rule argument is that there is nothing in the record establishing the exchange of notices between the MDOC and the prosecutor's office as required by MCL 780.131(1) to trigger its application. See *Williams*, 475 Mich at 256.[14] Finally, assuming that the 180-day rule was triggered in this case, the prosecution commenced an action on the charges well within 180 days after Beach was placed in the Detroit Reentry Center. Beach's argument regarding the 180-day rule, therefore, fails.

## IV. EVIDENTIARY ERROR RELATED TO JAIL LETTER

Beach also argues that he was unfairly prejudiced by the testimony of an MDOC employee interpreting his jailhouse letter as containing gang references, where there was no other evidence of his gang membership. Beach argues that his PSIR, which did not identify any gang affiliation, was evidence that he was not a gang member and further illustrates the error. We disagree and conclude that reversal is not warranted on this basis.[15]

At the threshold, we must clarify what Beach is arguing and what he is not. We note that there was essentially no real challenge to the prosecutor's position that Beach authored the letter, and Beach does not argue that the trial court should have excluded the letter from evidence. We also note that the trial court did not allow Officer Bechler to testify that Beach was in fact a member of the Vice Lords; rather, the trial court allowed Bechler to testify about language and symbolism in the letter. Beach merely challenges Officer Bechler's testimony that the letter contained language and symbolism consistent with that employed by the Vice Lords. Notably, he does not argue that the trial court improperly admitted Officer Bechler's testimony as lay opinion testimony, or that the prosecution improperly offered unnoticed expert testimony.[16] Instead, he argues that it

---

[14] We note that the *Williams* Court ruled "that under the plain language of MCL 780.131, the 180-day rule applies to inmates facing mandatory consecutive sentencing." *Williams*, 475 Mich at 254.

[15] This is essentially a claim of evidentiary error. Trial counsel objected to the subject testimony and evidence at trial on the same grounds raised on appeal, so the claim is preserved. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). We review preserved evidentiary issues for an abuse of discretion. *Id.* at 251. A trial court abuses its discretion when its decision falls outside the range of principled outcomes, and a ruling on a close evidentiary issue ordinarily cannot constitute an abuse of discretion. *Id.* at 251-252. The determination of whether to admit testimony frequently involves preliminary questions of law, e.g., whether a rule of evidence bars admission, and questions of law are reviewed de novo. *Lukity*, 460 Mich at 488. Regarding preserved evidentiary errors, "[n]o judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of . . . the improper admission . . . of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26. The effect of an "error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Lukity*, 460 Mich at 495.

[16] Contrary to the assertions in the prosecution's appellate brief, the trial court did not admit the opinion evidence on the basis that Officer Bechler was qualified as an expert under MRE 702 with

-14-

was irrelevant or violative of MRE 403 because (1) Bechler had no direct knowledge of Beach's gang affiliation, if any, and (2) Beach's PSIR, which was prepared after trial, did not identify any gang affiliation, which Beach argues establishes that he was not in a gang. We are not persuaded by either aspect of Beach's argument.

In general, evidence is admissible if it is relevant. See MRE 401 and 402; *People v Masi*, 346 Mich App 1, 17; 11 NW3d 521 (2023). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Under MRE 403, however, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Horton*, 341 Mich App 397, 404; 989 NW2d 885 (2022) (quotation marks and citation omitted). "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is substantially outweighed by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

Officer's Bechler's testimony did not violate MRE 403. Although the testimony enhanced the prosecution's case and its theory that the killing was gang-related, the letter was inculpatory and damaging to Beach even without Officer Bechler's testimony. The jurors on their own could have easily ascertained that Butts was killed for being an informant and that Beach was involved in the planning of the murder after consulting with other persons or a group. The fact that the persons or group may have been a gang, and specifically the Vice Lords, did not add much to the incriminating nature and impact of the letter. That Beach was referring to the murder of Butts is inescapable in light of the autopsy photographs contained in the envelope and the references in the letter. Moreover, even absent Officer Bechler's testimony, and as observed by the trial court, there already existed evidence connecting Beach to the Vice Lords because the gang's name was the password for his cell phone. In short, even if the trial court abused its discretion by allowing the challenged testimony, the presumed error was not outcome-determinative. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (the effect of an "error is evaluated by assessing it in the

---

respect to gangs and gang verbiage and symbolism. Rather, the court allowed the opinion based on the officer's personal knowledge garnered as a parole/probation officer and an MDOC intelligence officer, which effectively meant that the court allowed the testimony under MRE 701 (providing for the admission of lay opinion testimony). We assume without deciding that the trial court erroneously admitted the testimony as lay opinion testimony when it was really expert testimony (i.e., Bechler's in-depth knowledge of the language and symbolism used by the Vice Lords allowing him to fairly testify to a jury on the subject requires expertise gained through experience, training, and education went beyond an average officer's anecdotal knowledge of gangs). See *Bynum*, 496 Mich 610, 615; 852 NW2d 750 (2014). Because Officer Bechler would likely have been qualified to offer expert testimony anyway, any such erroneous admission as lay opinion testimony is likely harmless. Again, Beach has not challenged it on this basis.

context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error").  See also MCL 769.26.

The testimony by Officer Bechler supported the gangland-hit theory and was probative of and relevant to motive, intent, premeditation, and deliberation.  And the probative value of the opinion testimony was not substantially outweighed by the danger of *unfair* prejudice.  Beach's argument that he had no gang affiliation because the PSIR so indicated is not persuasive because that information in the PSIR was based solely on his own self-serving assertions and not any independent inquiry.  Beach contends that Officer Bechler had no personal knowledge of his background and history, but the officer never claimed that he had such knowledge, and the trial court made clear that he could not testify that Beach was a member of the Vice Lords.  Officer Bechler abided by the court's ruling and did not assert that Beach was a member of the Vice Lords.

Beach maintains that if he truly were affiliated with or a member of the Vice Lords, Officer Bechler would or should have personally known this fact in light of his position as an intelligence analyst for the MDOC and given Beach's past incarcerations in the state prison system.  This argument assumes that Officer Bechler should be personally familiar with every past and present MDOC inmate and their gang-association status.  Officer Bechler testified that he had no personal knowledge regarding Beach, and there was no evidence to the contrary.  Beach argues that Officer Bechler should have reached out to the investigating officer who prepared the PSIR and informed them about his gang affiliation or membership.  But there is nothing in the record indicating or suggesting that Officer Bechler's position involved providing PSIR information in regard to all inmates across the state.  And again, Officer Bechler never claimed that Beach was a member of the Vice Lords; he simply testified with respect to the language and symbolism found in the letter.  It was for the jury to evaluate—if it even found it necessary to do so—whether Officer Bechler's testimony and other evidence established gang membership or a gang connection.  We conclude that there was no error or harm related to Beach's claim of violations of MRE 402 or 403.

## V.  SLEEPING JUROR AND CONFUSED JUROR

Beach argues that his right to a fair trial was impaired by a sleeping juror.  We disagree.  Specifically, he contends that on the third day of trial, the court "announced that everyone had to stand because she saw a juror sleeping, but did not want to call anyone out."  Beach maintains that "[c]learly a juror was sleeping, but the record does not show which juror."  For support, Beach notes that after the court asked the jurors whether there were any questions following the testimony of a particular witness, a juror asked a question regarding a phone call for which there was no supporting testimony.  On the basis of the juror's question, Beach contends that it demonstrated "that at least one juror thought there was testimony they did not hear."

Because Beach raised this issue for the first time in his motion for new trial, not at the time the issue arose, the claim of error is unpreserved and subject to plain-error analysis.  *People v Davis*, 509 Mich 52, 64-65; 983 NW2d 325 (2022).  To obtain relief under the plain-error rule, a defendant must prove that (1) an error occurred, (2) the error was plain, which is to say obvious, and (3) that the plain error affected their substantial rights—in other words, the error affected the outcome of the proceedings.  *People v Anderson*, 341 Mich App 272, 280; 989 NW2d 832 (2022).  If a defendant satisfies these three requirements, we must determine whether the plain error warrants reversal, in other words, whether it seriously affected the fairness, integrity, or public

-16-

reputation of the judicial proceedings independent of the defendant's innocence. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Sometimes identified as a fourth prong of plain-error analysis, this last step conceptually overlaps with the third prong. *Davis*, 509 Mich at 75-76.

Beach was not denied his right to a jury trial because of the sleeping or confused juror, nor did he suffer any prejudice. Toward the end of day three of the trial and during the testimony of Detective Marko Prestage, the trial court interrupted, stating:

> Hold on one second. Let me have the jury stand for a minute. Okay. I'm not going to call anybody out, but I saw a juror asleep so I need everybody to stand cause you got to stay awake. This is a homicide trial. It's very, very important to both sides, okay.
>
> I think we're going to be done in about ten minutes anyway cause we keep getting booted off at three thirty and it's three nineteen. Okay. Everybody's awake. All right. Let's move on. Okay. Go ahead.

Subsequently, on the sixth day of trial and at the conclusion of testimony by Detective Sarah Markel, the trial court stated:

> All right. Um, the court has received a question and I have discussed this with defense. I will read the question as we believe what it says.
>
> Um, did we ever listen to the phone call between the 616 area code number and the victim? And, if so, was anyone other than the defendant on the phone line?
>
> Um, there have been no phone calls played as of this point in this trial. So, um, that would not be a question for this witness. We haven't heard any.
>
> And, so -- and, um, Detective Markel, you aren't -- you weren't listening to phone calls, were you?

Detective Markel responded that she had not been listening to phone calls.

In his motion for new trial, Beach presented the same argument that he now poses on appeal. The trial court rejected the argument primarily on the basis that it was speculative as to the identity of the jurors and it was speculative with respect to whether the incidents demonstrated a lack of impartiality or disqualified the juror(s) from exercising the powers of reason and judgment. The court also noted that trial counsel never asked that the juror(s) be questioned in regard to the two instances. The trial court subsequently entered an order rejecting Beach's "sleeping juror" argument.

A criminal defendant has a constitutional right to a fair and impartial jury. US Const, Am VI; Const 1963, art 1, § 20; *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008). Misconduct on the part of a juror does not automatically require a new trial. *Miller*, 482 Mich at 551. A new trial should be granted on the basis of juror misconduct only if:

the misconduct was such that it affected the impartiality of the jury or disqualified its members from exercising the powers of reason and judgment. A new trial will not be granted if no substantial harm was done thereby to the defendant, even though the misconduct may merit a rebuke from the trial court if brought to its notice. [*People v Messenger*, 221 Mich App 171, 175; 561 NW2d 463 (1997).]

"Prejudice must be shown, or facts clearly establishing the inference that it occurred from what was said or done." *People v Fetterley*, 229 Mich App 511, 545; 583 NW2d 199 (1998). In *People v Dunigan*, 299 Mich App 579, 586; 831 NW2d 243 (2013), this Court specifically considered a defendant's right to a new trial where a juror "had been observed to be sleeping" during witness testimony. This Court held that the defendant had not demonstrated that the juror's act of falling asleep affected the outcome of the trial. *Id*. The *Dunigan* panel found that "[t]he trial court properly admonished the juror," and it noted that "there is no indication of what, if any, testimony the juror missed." *Id*. This Court further stated that the defendant failed "to articulate how he was prejudiced," and instead made only "the bare assertion that the juror could not fairly and competently consider the charges against him and therefore was not qualified to give a verdict." *Id*. Accordingly, there was no factual support for the defendant's challenge. *Id*.

Here, there was no error, plain or otherwise, that would warrant vacating Beach's convictions and granting him a new trial on the basis of his right-to-trial and juror-misconduct arguments. To start, the record does not provide any specifics or elaboration regarding the two instances at issue. We do not know whether the "sleeping" juror merely nodded off for a moment and essentially missed nothing, intermittingly fell asleep, or slept through a larger portion of the testimony. Furthermore, we know nothing about the mindset or the thought pattern of the "confused" juror that led to his or her question, and perhaps the juror simply framed the question in an awkward manner that did not accurately reflect what the juror actually intended to ask. Although Beach complains about a failure by the trial court to identify the juror or jurors, had defense counsel sought some details and not forfeited the issue, perhaps the record would be more supportive of Beach's appellate arguments.[17] On the existing record, there is no basis to conclude that the jurors' impartiality was affected or that their powers of reason and judgment were diminished such that they were disqualified from participating in deliberations. Additionally, there is no evidence or information in the record suggesting that Beach was prejudiced. As argued by the prosecution, the two incidents occurred during the testimony of prosecution witnesses; therefore, if any testimony was missed or misunderstood, it likely would have been to the detriment of the prosecution and not Beach. Finally, even if the sleeping juror and the confused juror were one and the same, the barren record does not show a lack of impartiality, a diminishment of the powers of reason and judgment, or prejudice. In sum, Beach's argument does not merit reversal.

## VI. INSTRUCTIONAL ERROR

Beach argues that he was denied due process and his right to a fair trial when the jury was not properly instructed by the trial court in response to a question posed by jurors after they started

---

[17] Again, there is no associated claim of ineffective assistance of trial counsel.

-18-

deliberating. We conclude that this issue was waived at trial, and because Beach does not raise an ineffective-assistance-of-counsel claim related to the waiver, we decline to address the merits.

Waiver is "the intentional relinquishment or abandonment of a known right." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) (quotation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id.* (quotation marks and citation omitted) Specifically in the context of jury instructions, "[w]hen defense counsel clearly expresses satisfaction with the trial court's decision, counsel's action will be deemed to constitute a waiver." *Id.*

Here, the issue relates to the trial court's clarifying instruction on aiding and abetting. The trial court provided the jury with the pattern instruction on aiding abetting related to the murder charge. This included that (1) the crime was actually committed by Beach or someone else, (2) that Beach did something to assist the commission of the crime, and

> *And, third, at the time the defendant must have intended the commission of the crime alleged or must have known that the other person intended its commission or that the crime alleged was a natural [and[18]] probable consequence of the commission of the crime intended.*

The trial court then instructed the jury on the elements of the offenses of first-degree premeditated murder, second-degree murder, and felony-firearm. Then, during deliberations, the jury sent the trial court a question, which the court discussed on the record:

> The note is can you please breakdown aiding and abetting sub point C, specifically define the difference between crime alleged and crime intended. And under aiding and abetting which is the Jury Instruction 8.1 sub point C is, third, at the time the defendant was -- must have intended the commission of the crime alleged or must have known that the other person intended its commission or that the crime alleged was a natural and probable consequence of the commission of the crime intended. Um, I don't believe that it's in this court's, um, authority to start defining things for the jury, um, and/or to start breaking down differences between what crime alleged and crime intended is. Um, clearly the only thing, you know, it's talking about the crime that it list in there. But to start giving them definitions, I don't think it's in this court's purview. I think that's for them, and I'll, I'll take any, um, comments from counsel.

---

[18] The transcript contains the word "on," which makes no sense in the context of the sentence. We presume that either the trial court misspoke or the court reporter made a transcription error. M Crim JI 8.1(3)(c) indicates that the correct language is "natural and probable consequence." Defendant does not raise any issue about the matter and, as later addressed, when rereading that part of the instruction to the jury, the trial court used the conjunction "and."

After some discussion, the trial court agreed to simply reread the aiding-and-abetting instruction, while noting that the effect would be that the jury's question would go unanswered. When the jury returned to the courtroom, the trial court instructed the jurors as follows:

> Uh, aiding and abetting under the jury instruction sub point C, third, at the time the defendant must have intended the, intended the commission of the crime alleged or must have known that the other person intended its commission or that the crime alleged was a natural and probable consequence of the commission of the crime intended.

> The court cannot, uh, provided you, uh, definitions and differences. You're gonna have to go by what you know those words to mean and discuss among yourselves whether what you believe that to mean. But everything you need is in that jury instruction if you read it carefully.

> So, that is all I'm gonna say on that. Um, but I cannot give you differences because I guarantee you one or the other side will probably not agree to what has been said. So, um, I'm gonna leave that in your purview.

The trial court asked the attorneys whether they had anything to say regarding the manner in which the court instructed the jury, and defense counsel responded, "No, your Honor." This expression of agreement with the trial court's decision was a waiver.[19] Because Beach's argument was waived, and he does not raise an ineffective-assistance-of-counsel claim, we decline to reach the merits of this issue.

## VII.  CUMULATIVE EFFECT

Finally, Beach argues he was denied due process and a fair trial by the cumulative effect of the errors discussed earlier. We disagree.[20]

The only error, arguably, was allowing Officer Bechler to testify to his opinion regarding the language and symbolism in the letter *as a lay witness*; therefore, Beach's argument that the "cumulative effect" of multiple errors justifies relief necessarily fails. In his motion for new trial, Beach presented this same argument. At the hearing on the motion, the issue was not addressed

---

[19] In his motion for new trial, Beach essentially presented the same arguments that he now makes on appeal. At the hearing on the motion, the trial court ruled that the issue had been waived. During the hearing, appellate counsel, who represented Beach in relation to the motion for new trial, vaguely asserted ineffective assistance of counsel for waiving the issue, though that issue was not raised in the motion for new trial. The trial court found that trial counsel had not been ineffective. The court later entered an order rejecting Beach's assertion that error occurred for failure to clarify the jury instructions. Like his motion for new trial, in his appellate brief, Beach does not raise an ineffective-assistance-of-counsel claim related to the waiver.

[20] Whether the cumulative effect of errors justifies relief is a matter that concerns a defendant's right to a fair trial, which is an issue of law subject to de novo review on appeal. See *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009).

or ruled on because the trial court had rejected all of the underlying arguments. The trial court entered a general order denying the motion for new trial.

In *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007), this Court addressed the principle of "cumulative error," stating:

> We review this issue to determine if the combination of alleged errors denied defendant a fair trial. *People v. Knapp*, 244 Mich App 361, 387-388; 624 NW2d 227 (2001). The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted. *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002). Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal. *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).

In this case, there were not several or multiple errors; therefore, the cumulative-effect argument necessarily fails. Confidence in the reliability of the verdict has not been undermined.

## VIII. CONCLUSION

For the reasons previously stated, we affirm.

/s/ Allie Greenleaf Maldonado
/s/ Sima G. Patel
/s/ Noah P. Hood

-21-